No. 3–09–0559

Filed October 26, 2010

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2010

| | | |
|---|---|---|
| PAT V. ASHLEY AND SCOTT WAPLE, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiffs-Appellants, | ) | Kankakee County, Illinois, |
| | ) | |
| v. | ) | |
| | ) | |
| IM STEEL, INC., an Illinois Corporation, and | ) | No. 01--L--133 |
| MARC POZAN, Individually, as an Officer or | ) | |
| Agent for Global Steel Trading Corp., | ) | Honorable |
| Belson Scrap & Steel, Inc., and IM Steel, Inc., | ) | Kendall O. Wenzelman |
| | ) | Judge, Presiding |
| Defendants-Appellees. | ) | |

JUSTICE WRIGHT delivered the opinion of the court:

Plaintiffs filed a multiple, count complaint against defendants alleging violations of the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq*. (West 2000)). On January 2, 2002, the trial court entered a default judgment against defendants Global Steel Trading Corporation (GST) and Belson Scrap & Steel, Inc. (Belson). Thereafter, the court conducted a bench trial on plaintiffs' third amended complaint requesting the court to hold defendants IM Steel, Inc. (IM Steel), and Marc Pozan (Pozan) separately responsible for unpaid wages and commissions pursuant to the Illinois Wage Payment and Collection Act.

The trial court found in favor of defendants Pozan and IM Steel, Inc., on the basis that plaintiffs' claimed commissions accrued after the date of the voluntary assignments for the

benefit of creditors, which relieved Pozen and IM Steel from obligations pursuant to the Illinois Wage Payment and Collection Act. Plaintiffs appeal the court's ruling in favor of defendants IM Steel and Pozan. GST and Belson are not parties to this appeal.

We affirm the trial court's finding that IM Steel was not a successor corporation to GST and Belson, and therefore, cannot be held liable for commissions not paid by GST or Belson. We also affirm the trial court's finding that Pozan could not be held responsible under section 13 of the Act for commissions in the amount of $74,028.76 for unpaid commissions for sales to Manitowoc Cranes on behalf of GST and $1,987.73 in commissions claimed by plaintiffs for sales arranged as employees of IM Steel.

We reverse the trial court's finding that all other unpaid commissions accrued after the date of the assignment for the benefit of creditors and similarly conclude that the date of the assignment does not extinguish Pozan's *potential* obligation under section 13 of the Act to provide compensation for recently terminated and ongoing employees during the period of the voluntary assignment. We conclude the issue of fraud is not relevant to the outcome of this appeal and refrain from considering the trial court's ruling on the issue of fraud. Therefore, we remand the matter for the trial court to decide the issue of whether plaintiffs established that they were employees of either GST or Belson and to determine the other issues raised in plaintiffs' third amended complaint consistent with this opinion.

FACTS

The financial information contained in the exhibits and testimony included in this record is extensive. For purposes of this appeal, we have limited our recitation of the facts to a brief overview of the relationship of the parties and a condensed summary of the exhibits and those

portions of the testimony which may be relevant to the purported unpaid commissions and the date of accrual for those commissions in this case.

GST and Belson were corporations operating as wholesale distributors of steel. Pozan served as president and treasurer of GST and also served as president of Belson. On June 25, 1999, plaintiffs entered into a written agreement with GST to exclusively sell steel plate and procure new customers for GST and Belson.

GST and Belson executed assignments for the benefit of creditors on May 7, 2001. The assignment named Howard B. Samuels, as assignee, and allowed the trustee to operate the businesses and liquidate the assets of each corporation in order to satisfy the secured creditor, American National Bank.

Several days later, on May 10, 2001, IM Steel was incorporated. Marc Pozan, the only shareholder, was named as corporate president of IM Steel.

On July 20, 2001, plaintiffs demanded payment for unpaid wages by letter addressed to Pozan as president of GST. This letter was admitted as plaintiffs' Exhibit C. On October 8, 2001, plaintiffs demanded payment for unpaid wages by letter to Pozan as president of Belson. This letter was admitted as plaintiffs' Exhibit E. On October 8, 2001, plaintiffs also separately demanded payment for unpaid wages by letter to Pozan as president of IM Steel. This letter was admitted as plaintiffs' Exhibit F. On October 26, 2001, plaintiffs filed a complaint at law against all three corporate defendants and Pozan as a corporate officer.

On January 2, 2002, the trial court found corporate defendants GST and Belson in default. On March 4, 2002, after receiving evidence, the court entered a written judgment in favor of plaintiffs and against GST and Belson for unpaid back wages in the amount of

3

$128,881.41, attorney fees of $2,350, and costs of $194 plus prejudgement interest from May 1, 2001, to February 2, 2002, in the amount of $4,872.78. Those defendants are not parties to this appeal.

On January 7, 2003, plaintiffs filed their third amended complaint based on violations of the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq*. (West 2000)) (Act). Count I alleged that Pozan was personally responsible for the payment of plaintiffs' past due commissions because, while acting as an officer of GST, Pozan knowingly permitted the corporation to violate the Act. Count II alleged that Pozan was personally responsible for the payment of plaintiffs' past due commissions because Pozan, acting as an officer of Belson, knowingly permitted the corporation to violate the Act. Count III alleged IM Steel, the corporation, failed to pay plaintiffs' past due commissions in violation of the Act. Count IV alleged that Pozan was personally responsible for the payment of past due commissions payable to plaintiffs because Pozan, an officer of IM Steel, knowingly permitted the corporation to violate the Act. Beginning on March 9, 2009, the trial court conducted a multiple day bench trial on plaintiffs' third amended complaint against defendants IM Steel and Pozan. Those portions of the trial transcripts that are relevant to the issues raised in this appeal are set out below.

Marc Pozan

Marc Pozan was the first witness to testify during the five-day bench trial, and his testimony took place during several days of the trial. Pozan testified that he was president of GST and Belson. Once IM Steel was incorporated on May 10, 2001, Pozan also served as president of IM Steel.

He testified that, at the time, Pat Ashley and Marc Waple worked for GST. Pozan

4

testified that plaintiffs' Exhibit A, plaintiffs' written employment agreement, was signed by Pozan as president of GST and Issac Vadish as vice-president on June 25, 1999. According to Pozan, the written document designated Ashley's and Waple's duties to GST to include developing customers for GST in Michigan for the purpose of selling those customers stock plate from GST's inventory. The document required Ashely and Waple to work exclusively for GST and, in exchange for this exclusivity, GST agreed to pay a 5½ % commission to plaintiffs on "burning" sales based on the gross invoice for each customer. Pozan later testified that the industry standard rate was 4 %, but he agreed to pay them 5½ % because "they wrote their own contract."

According to Pozan, American National Bank was a secured creditor for GST. As a secured creditor, the bank decided an assignment for the benefit of secured creditors was appropriate due to the declining financial condition of the corporation. Pozan testified that Belson and GST were cross-collateralized. Pozan testified he did not care how the corporation closed and that it was the bank's choice whether the corporation would go into chapter 7 (11 U.S.C. §701 *et seq*. (2000)) bankruptcy or became subject to a voluntary assignment for the benefit of creditors. Pozan said the bank would not finance ongoing operations as required for chapter 11 (11 U.S.C. §1101 *et seq*. (2000)) bankruptcy.

As president of both corporations, Pozan signed the assignments for the benefit of creditors for GST and Belson.[1] Pozan testified that he had no idea whether GST owed Ashley

[1] According to Pozan, when the assignment for the benefit of creditors began on May 7, 2001, GST had $10,550,000 in assets, $7,500,000 in secured debt, and $3 million in assets above the amount of secured debt. The assignment pertaining to GST is contained in the record as

and Waple commissions on May 7, 2001, the date of the assignment for the benefit of creditors, because he was not the comptroller for GST. Pozan stated that once the assignment for the benefit of creditors went into effect in 2001, he considered himself president of GST "with no power to do anything." Later in his testimony, Pozan said, "I gave him [assignee] advice on who should get paid, if anyone[,] after the assignment, and for what reason, such as Pat and Scott." Further, he testified that he discussed paying the commissions that were due to the sales staff at the time of the assignment so that the salespeople would help collect the outstanding receivables from customers. Pozan testified that it made good sense to "pay out some commissions that were due."

According to Pozan, the assignment for the benefit of creditors continued for one year until June 3, 2002. Counsel directed Pozan to Exhibit E, a document dated October 8, 2001, from Ashley and Waple demanding $74,028.76 for unpaid commissions for sales to Manitowoc Cranes on behalf of GST. Pozan testified that he did not consider himself to be president of GST on October 8, 2001, so he turned the letter, demanding commissions, over to the trustee.

Pozan stated that after the assignment for the benefit of creditors occurred, any money paid by customers on outstanding accounts receivable became assigned income which could not be used to pay employees. Pozan stated that payment of plaintiffs' commissions, that accrued from payments received by the trustee on GST's accounts receivables, would have given Ashley and Waple preferential treatment over other creditors. He testified that such preferential treatment would be contrary to the terms of the assignment. Pozan advised the judge that

plaintiffs' Exhibit K, and the assignment pertaining to Belson can be found as plaintiffs' Exhibit M. Both assignments are also contained in the record as defendants' Exhibits 32 and 34.

6

plaintiffs were unsecured creditors. Further, Pozan explained to the court that unsecured creditors were not paid during the final settlement after liquidating GST's and Belson's assets. Pozan also explained that plaintiffs received some commissions shortly after the assignment in order to move the business forward to facilitate liquidation.

After viewing page 2 of GST's corporate worksheet, marked as plaintiffs' Exhibit I, Pozan agreed the worksheet showed, prior to the assignment, plaintiffs earned commissions on unpaid invoices totaling $34,983.61 for material shipped to various customers and invoiced to those customers. Pozan explained industry custom would view those commissions as unearned and not due until these "invoices are paid for." Pozan testified that he assumed some portion of those invoices, forming the basis for commissions in the amount of $34,983.61, had been received by the bank during the time frame of the assignment for the benefit of creditors.[2] All the accounts receivables for both GST and Belson were assigned to the bank as a result of the assignment for the benefit of creditors.

During his testimony, Pozan explained his handwritten note found on the face of defendants' Exhibit 43-12 , an invoice dated June 25, 2001, and written on IM Steel letterhead. The note indicated that the customer, Schaeff, Inc., rejected $12,200 in burned parts delivered by IM Steel due to heavy rust. This exhibit also contains a handwritten notation dated July 3, 2001, signed by "Marc." During his testimony, Pozan agreed he made the notation which indicated that the rejected burn parts became plaintiffs' "problem" and further noted that, if GST took the materials as scrap, the balance "comes off" plaintiffs' commissions. Pozan stated the note was

[2]As of May 14, 2001, Belson had $1 million in accounts receivable, and GST had nearly $4 million in accounts receivable (Exhibits L and B).

7

intended to inform Ashley of "my decision on what to do." When asked if defendants' Exhibit 43-12 showed that he did not pay plaintiffs' commission, he stated "I think so, yes. It wasn't I didn't pay them their commission - well, I guess it was. This is an IM thing, yes."

Pozan testified that, as president of IM Steel, he agreed with the trustee to arrange for sales to liquidate GST's and Belson's inventory and would be paid a 35 % commission for his services. This non-exclusive sales agreement was identified during Pozan's testimony as plaintiffs' Exhibit N. Pozan also testified to the details of the settlement with American National Bank, the secured creditor, as set out in plaintiffs' Exhibit O.

Further, Pozan testified that he purchased $498,528 of GST's "post" accounts receivable. Pozan explained post accounts receivables were "receivable's that the bank could not collect, that I thought I could collect, and I paid them [$]498,000 for it." According to Pozan, these receivables were assets that went into the trust, and he bought them from the trust together with other physical assets of the corporations. Pozan testified that he spent $1,904,000 as the purchaser of the corporate assets from the trustee and earned commissions on those sales as president of IM Steel.[3] Pozan clarified that he owned 100 % of IM Steel and referred to himself personally instead of referring to the corporation, IM Steel, as purchaser due to his percentage of ownership.

According to Pozan, the bank collected $406,000 on accounts receivable for IM Steel

---

[3]Plaintiff's Exhibit O-1 reports that IM Steel agreed to pay $628,615.75 for equipment, $462,000 for Belson Steel Center, $240,000 for remaining Belson inventory, $75,000 for inventory discrepancy, and $498,528 for "post accounts receivables" for a total due from IM Steel to the trustee in the amount of $1,904,143.75.

8

during the time frame of the assignment and credited this amount toward IM Steel's purchase of GST and Belson assets, which occurred during the liquidation process. Throughout this portion of his testimony, counsel directed Pozan to plaintiffs' Exhibit O-1. Pozan agreed this exhibit documented that IM Steel earned $675,000 in commissions on the sales of assets subject to the assignment. According to Pozan, the bank "held" the $675,000 which IM Steel earned for arranging sales of corporate assets. Pozan testified that the trustee collected accounts receivables for GST and Belson, but "held" those amounts collected.

Instead of designating monies collected on GST's and Belson's accounts receivables, during the year of the assignment, as assigned income to pay secured and unsecured creditors of GST and Belson, the trustee " held" $406,000 collected by the trustee on GST and Belson accounts. Later, according to Pozan, the trustee credited IM Steel with $406,000 received from GST and Belson accounts toward the payment of assets purchased by IM Steel.

Pozan agreed that during final settlement, the bank gave IM Steel a credit of $406,000 in collected accounts receivables and $675,000 for commissions on the sales of liquidated assets. This combined credit totaled $1,081,450.46, and according to Pozan, was applied by the trustee toward IM Steel's debt of $1,904,143.75 for the assets IM Steel purchased during the liquidation process. Consequently, as a result of the final settlement with the bank, Pozan received credit for $1,081,450.46, which the bank used to reduce the balance Pozan, on behalf of IM Steel, owed to the trust to the amount of $822,693.29. This final figure represented the amount IM Steel owed the bank for the purchase of the liquidated assets formerly belonging to GST and Belson.

Scott Waple

Like Pozan, Scott Waple testified to the agreement dated June 25,1999, and marked as

9

plaintiffs' Exhibit A.  Waple stated that this written document set out the agreed rates for plaintiffs' commissions on purchase orders for GST and provided that commissions would be paid after "payment of customer invoices."

Waple described the method by which GST would compensate him for sales pursuant to the written agreement dated June 25, 1999.  According to Waple, he:

> "[W]ould sell accounts whether it was stock plate, or burning, or fabricating, depending on the order, either we took care of outside processing or the order was processed at Global Steel Trading, Bourbonnais, or Alabama.  We would pretty much set up the trucking for deliveries so everything was on time.  And once there was a signed bill of lading, the Global Steel Trading would invoice the account accordingly and accept all monies – or whatever money was due."

Waple stated that his office in Michigan was directly linked to the computer at GST in Bourbonnais, Illinois, and he used this direct connection with Bourbonnais to access business records concerning available GST inventory to fulfill prospective sales orders.

He explained that, after he wrote up an order for a customer, the order had to be first accepted by GST based on the customer's credit information.  If accepted by GST, it was Waple's job to decide what type of steel in GST's inventory would work best for the burning application required for that order.  He would then make an assignment to the burning department consistent with his decision regarding the type of steel to use.  Often, he traveled to Bourbonnais to personally inspect and select the most suitable steel for a customer's order.

Waple testified that in addition to acting as a salesperson, he became an "integral" to the

burning operations for GST. According to Waple, Issac Vadish did not have an official title at GST, but was considered to be the head of sales at GST. Waple reported to Vadish on a daily basis and spoke to Pozan weekly or biweekly.

At some point in time, Waple was informed that "we would no longer work for GST, we would now be working for Belson Steel." He indicated that he was employed at Belson "for a short period of time" and conducted business as usual. Shortly thereafter, Waple and Ashley learned they would not be working for GST or Belson. Waple was advised by "Marc Pozan direct" that they could no longer sell to Manitowoc Cranes. Waple testified that he accepted the offer to make sales for IM Steel, but that he would earn reduced commissions for sales for IM Steel.

Waple admitted that the subsequent employment arrangements with IM Steel were not in writing and included a different commission structure in comparison to the commissions for GST sales. Waple testified that the sales commission structure he accepted with IM Steel was reduced by one-half of a percentage point from the sales he previously arranged for GST customers. Further, he was limited to acting as a salesperson of steel plate, only because GST's burning department was closed two months before the "ABC" (assignment for the benefit of creditors).

Waple stated "we were scrambling to stay alive, to make sales as stock plate to stock plate customers." However, Waple stated, "[r]ight after we started with IM we were told we could continue working for IM Steel, but anything owed us from GST and Belson was in the past and gone. We could start fresh with IM Steel." On approximately May 5, 2001, Pozan advised Waple and Ashley that the Manitowoc Cranes business would "not work for IM Steel."

Waple testified that throughout their association with GST, Belson, and IM Steel, he and

11

Ashley kept track of their commissions in an Excel file. As part of this file, they identified their individual sales for the corporation by cross-referencing their commissions to the numbers they obtained by computer from GST's sales reports. At the end of each month, Waple and Ashley "would make sure our numbers matched Eric Martell's [spread sheet] numbers at the end of every month."

According to Waple, before he ceased working for GST, he arranged for sales to Manitowoc Cranes. According to Waple, Manitowoc faxed purchase orders directly to Waple for counterweight fabrications, and these purchase orders totaled $1,345,977.50. Waple calculated the 5½ % commission on the accepted sales to Manitowoc totaled $74,028.76. However, Waple testified that ultimately these sales were cancelled by Manitowoc.

Waple explained that Exhibit I, prepared by Pat Ashely, was a monthly shipment and commission report. Waple advised the court that, based on Ashely's report, plaintiffs' unpaid commissions from sales to various customers totaled $54,852.65, as set out on line 39 of plaintiff's Exhibit I. He testified that Pozan "kept" $14,500 from these commissions. Additionally, Waple explained a handwritten note on the form indicated Manitowoc commissions from canceled sales would have resulted in a commission of $74,028.76. According to Waple, after adding the $54,852.65 in commissions from various customers to the commissions from Manitowoc $74,028.76, the combined total of commissions which had not been paid by GST equaled $128,881.41.

In addition, Waple also testified that GST owed plaintiffs commissions for sales to Andrica Metals and Macomb Steel which were not included in the monthly setup sheets generated by Martell. Waple testified that, throughout the entire time period he worked for GST,

12

the Andrica Metals and Macomb Steel commissions were never paid by GST. According to Waple, paragraph 12 of the 1999 employment agreement required GST to pay Ashley and Waple commissions for sales to Macomb Steel and Andrica Metals, two companies located in Michigan. Waple stated that he discovered GST was fulfilling sales orders to these companies by "the modem hook up we had with Global Steel Trading." They did not receive any commissions on sales to Macomb Steel or Andrica Metals and repeatedly spoke to Eric Martell about this commission. Referring to plaintiff's Exhibit I, Waple agreed that the unpaid commissions for Andrica Steel and Macomb Steel were listed in handwriting as $17,027.58.

### Pat Ashley

The next witness, Pat Ashley, testified that even if the sales to Andrica Metal and Macomb Steel were facilitated by other sale persons for GST, their agreement with GST required GST to pay plaintiffs commissions on any sales to Andrica Metals and Macomb Steel occurring after July 1, 1999. Ashley explained that the reason for this provision in their agreement with GST was because Andrica Metals and Macomb Steel had been plaintiffs' customers prior to their agreement to sell GST's steel exclusively.

According to Ashley, after July 1, 1999, GST did not pay plaintiffs any commissions based on sales to Andrica Metals and Macomb Steel. However, she accidentally discovered that GST had been making sales to Andrica Metals and Macomb Steel using other sales staff. After unexpectedly discovering this information, plaintiffs repeatedly requested payments for these commissions when communicating with Martell.

Ashley explained that later she learned they would no longer be salespersons for GST after the effective date of the assignment. According to Ashley, she was also informed that GST

13

would not pay any commissions based on invoices paid after the date she ceased working as a salesperson for GST. When she asked why earned commissions would not be paid, Pozan told her he would look into it.

Ashley testified to the contents of plaintiff's Exhibit BB. According to Ashley, this exhibit contained Martell's handwritten note indicating he would send this amount to "payroll," and she should take it up with Vadish and Pozan from there. Shortly after her employment with GST ended, Martell faxed an offer to her to conduct steel plate sales on behalf of the newly formed IM Steel. The new arrangement did not permit sales to Manitowac Cranes and also resulted in lower commissions for all sales.

Eric Martell

Plaintiff's fourth witness was Eric Martell, the office manager and credit manager of GST from 1999 until October 2001. Before he worked for GST, he worked for Belson from 1995 to 1999. After his employment with GST ended in 2001, he became a salesman for IM Steel.

Martell testified that, as office manager for GST, he did the accounting for the business, including accounts payable and accounts receivable, and issued corporate checks. He testified that he was employed by GST during the assignment for the benefit of creditors. He was also in charge of putting together monthly commission sheets for the salespersons, Ashley and Waple. As part of the process of calculating these commissions, he would make adjustments to the commissions and provide an explanation for his calculations. Turning to plaintiffs' stapled group of pages marked as plaintiff's Exhibit I-2, Martell indicated he prepared all of the schedules other than the first two pages. He explained that each asterisk next to a sale indicated the customer paid the invoice and also revealed the month in which GST received that payment.

14

Martell explained the information contained in plaintiff's Exhibit I-3, which was prepared on June 5, 2001. According to this exhibit, GST's year-to-date sales as of March 2001 for Andrica Metals totaled $131,302.26. Referring to the same exhibit, Martell indicated GST's sales for the previous year, January through December 2000, for Andrica Metals totaled $146,396.29. Martell testified that GST did not pay plaintiffs any amount for commissions based on these sales in 2000 and 2001. Martell did not provide a calculation of the commissions based on these year-end sales figures.

Martell testified that plaintiffs questioned Martell on a monthly basis regarding the reason why they were not receiving commissions on these sales to Andrica Metals. According to Martell, he informed plaintiff that the vice-president of GST, Issac Vadish, was the "one that was holdin' the payment up."

Martell testified that on one occasion, Pozan instructed him to reduce plaintiffs' commissions by $6,000 for burn parts that "were still on the floor that weren't shipped out to customers." Defendant's Exhibit 5-90 includes a note to this effect.

With regard to Exhibit BB, Martell explained the note on the bottom of that page was in his handwriting and read, "Pat, Here is what's due to you [$12,160.60]. I will give to payroll, but take it up with Marc and Issac. I'm not in the middle of this." Martell stated that he wrote this note after the assignment. Martell reported the "total due" commissions to Ashley and Waple, based on paid invoices, was $12,160.60. Defendant's Exhibit 5-89 reflects this same amount.

Exhibit BB showed commissions owed for April to be $14,891.72 and commissions due for May to be $4,624.87. The only remaining unpaid invoices for sales that existed before the date of the assignment equaled $3,487.42. Martell explained that, after the assignment, GST

15

commissions were not paid unless first approved by the trustee.

Martell was questioned regarding plaintiffs' Exhibit CC, which was a fax dated September 11, 2000, containing Martell's handwriting. According to Martell's note, he was instructed by Vadish to pay a 1 % commission for sales on United Fixtures and Central Power and was instructed not to pay any commissions on Manitowoc Cranes. Later in his testimony, he explained the "scribble" and the "1 %" noted on the face of that fax was consistent with what Vadish wrote next to United Fixtures.

During cross-examination, Martell explained the monthly commission sheets he prepared were created within 10 days of the last day of each month. For example, he stated that if the schedule reflected January commissions, he would create the document within the first 10 days of February and then communicate those numbers to plaintiffs. If plaintiffs did not agree with Martell's figure, they would contact him.

Martell also described the market in 2000 "was turning down." Vendors for GST were calling and asking to be paid, and at a minimum, it was taking 60 days to pay them. After the assignment for the benefit of creditors on May 7, 2001, GST continued to take orders from Manitowoc Cranes for burn parts according to Martell. All income and payments went into the assignee's account. However, GST continued to operate its business, and the assignee determined which orders to fill as the inventory was liquidated, but the burning operation ceased.

Martell assisted the trustee with invoices. Martell testified that Exhibit 5-79 showed the amount of $8,270.29 "was due" to plaintiffs from February 2001. Martell testified that this amount was paid. Further, he explained that in March 2001, GST owed plaintiffs $15,073.15 in commissions for paid invoices received by March 2001. Martell said the amount reflected in

16

plaintiffs' Exhibit DD ($6,595.84) was paid to plaintiffs.

Martell stated that Pozan did not instruct him to withhold commissions for "Andrica or Macomb." Martell also stated that any amount collected from Andrica Metals or Macomb Steel did not result in a commission for plaintiffs.

According to Martell, referring to plaintiffs' Exhibit DD, GST paid plaintiffs $205,975.86 in commissions prior to June 2001. After the assignment, plaintiffs received two checks from the trustee for commissions. On June 22, 2001, the record shows the trustee paid plaintiffs $5,462.00 from the GST trust account. Defendant's Exhibit 6-2, is a check dated July 20, 2001, written in the amount of $3,660.60 and issued to plaintiffs.

Kevin Kennell

The fifth witness for plaintiffs was Kevin Kennell, vice-president and Chief Executive Officer for IM Steel and Belson. Generally, he explained the financial condition of GST and Belson that existed at the time of the assignment and provided the details of the final settlement with the bank once the assignment ended. Following Kennell's testimony, the defense requested a directed finding. The court denied the motion for a directed finding.

Court's Ruling

At the conclusion of the trial, the trial court took the matter under advisement. On May 8, 2009, the trial court entered a written order. In the order, the court stated it was unnecessary to determine whether plaintiffs were employees for purposes of the Act. The court found that even if plaintiffs were found to be employees, plaintiffs failed to prove any of the counts set forth in the complaint and ruled in favor of defendants Pozan and IM Steel. The details of the court's findings are outlined in the analysis below.

17

Plaintiffs filed a timely notice of appeal.

ANALYSIS

The four counts of plaintiffs' third amended complaint included claims based on the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq*. (West 2000)). Counts I, II, and IV separately alleged that Pozan was personally responsible for the payment of plaintiffs' pastdue commissions because, while acting as an officer of three corporations, specifically, GST, Belson, and IM Steel, Pozan knowingly permitted each corporation to violate the Act. Unlike all other counts, count III was not directed against Pozan personally. Count III alleged IM Steel failed to pay plaintiffs' pastdue commissions in violation of the Act.

Following a multiple day bench trial, the court ruled in favor of Pozan and IM Steel based on the following findings:

"1. The unpaid compensation claimed by plaintiffs accrued during a period of time when business decisions were made and controlled by persons other Pozan;

2. Plaintiffs failed to prove 'that what occurred with Belson and GST were the result of anything other than the then current business conditions as opposed to being the result of fraudulent or ulterior motive on the part of Pozan;'

3. Defendants were not successors in interest to the prior entities of GST and Belson;

4. Plaintiffs failed to prove defendants engaged in any activity with a fraudulent or ulterior motive; and

18

5. Plaintiffs' failure to receive claimed compensation was not due to the acts of IM Steel or Pozan but instead were 'due to economic factors and the actions and decisions of the lender of GST and the [*sic*] Belson'."

Here, the trial court's order did not specify for this court what evidence contributed to the court's findings set out above. Thus, we must review all of the detailed business records and the testimony of the witnesses in order to evaluate the court's findings. Only after achieving a comprehensive understanding of all the evidence can a court of review properly *measure* whether the manifest weight of all the evidence presented to the court required a different result as plaintiffs contend on appeal.

Date of Accrual

Plaintiffs challenge the court's determination that the "unpaid compensation claimed by Plaintiffs accrued during a period of time when business decisions were being made and controlled by persons other than Mark Pozan." Without addressing the date of accrual, defendants assert the trial court was correct. We review the trial court's finding by using a manifest weight of the evidence standard. *Eychaner v. Gross*, 202 Ill. 2d 228, 251-52 (2002).

According to the terms of the purported 1999 employment agreement between plaintiffs and GST, plaintiffs' commissions did not "accrue" based on the date of the purchase orders. The language of the agreement, which is consistent with the custom of the industry described by Pozan, provided that plaintiffs' commissions "accrued" when each customer actually paid the invoice for purchased goods.

Eric Martell, the office manager and credit manager of GST from 1999 until October

19

2001, completed monthly worksheets for the purpose of calculating the amount of both cumulative sales and monthly accrued commissions based on these cumulative sales. Martell's testimony established that GST and Belson paid plaintiffs on a monthly basis during the course of the last two years. His testimony also confirmed that plaintiffs received commissions only for invoices actually paid by the customers during the previous month.

Concerning the amount of accrued commissions, both parties relied heavily on the same undisputed business records generated by Martell for GST and Belson. Martells' worksheets revealed that only a small portion of GST's and Belson's customers had not paid for invoiced goods before the last day of April 2001. According to the last GST worksheet, prepared within the first 10 days of May 2001, all customer invoices had been paid for purchase orders arranged by plaintiffs with the exception of unpaid invoices that totaled $3,487.42.[4] In this case, plaintiffs did not request the trial court to calculate, assess, or require either Pozan or IM Steel to pay commissions based on those unpaid customer invoices, totaling $3,487.42.

The exhibits in the record document that the trustee paid the accrued March commissions in June and paid the commissions that accrued in April during the month of July 2001. Apparently, the trial court concluded the date the corporation paid the commissions dictated the date of accrual for purposes of the Act. We disagree. The custom of the industry described by Pozan during his testimony controls the date of accrual in this case. Consequently, the date each

[4] Plaintiff's Exhibit BB shows commissions calculated based on paid invoices for April to be $14,891.72, and commissions calculated based on paid invoices for May to be $4,624.87. This exhibit shows outstanding unpaid invoices from sales that occurred on or before May 1, 2001, totaled $3,487.42.

20

commission accrued was established based on the date the customer paid the invoice, not the date the company paid the commission.

Based on this record, the trial court's finding that the claimed, unpaid commissions "accrued" after May 7, 2001, was contrary to the manifest weight of the evidence and must be reversed.

## Employee/Employer

On appeal, we have been requested by defendants to determine whether plaintiffs were employees of GST, Belson and/or IM Steel. The trial court did not decide whether plaintiffs were employees of each corporation because the trial court found the issue of employment was irrelevant after finding that the commissions accrued after the date of the assignment and that plaintiffs could not prove the allegations contained in their third amended complaint. Since the trial court did not make any findings concerning whether plaintiffs were employees of the corporations in question, we will not address the issue and remand this issue to the circuit court for further consideration.

## Unpaid Commissions

Next, we must consider the issue of whether plaintiffs' evidence proved they did not receive compensation as required by the Act. When addressing this issue, we consider the alleged unpaid commissions with reference to the individual customers of GST and Belson.

## Manitowoc Cranes

The record reveals Manitowoc Cranes cancelled their purchase orders, arranged by plaintiffs, which would have resulted in commissions of $74,028.76 from those purchase orders, if paid. Because the purchase orders were not fulfilled, the anticipated commissions simply

21

*never* accrued according to the terms of the purported employment agreement between GST or Belson and plaintiffs. We affirm the trial court's decision denying compensation for commissions based on the canceled purchase orders placed by Manitowoc Cranes.

United Fixtures and Central Power

Next, we consider whether plaintiffs' evidence established that GST and Belson failed to compensate plaintiffs for sales to United Fixtures and Central Power that occurred prior to the assignment. Martell testified that plaintiffs' Exhibit CC, a GST invoice dated September 11, 2000, indicated that United Fixtures and Central Power commissions existed prior to September 11, 2000, and were calculated for payment at the rate of 1 % by Martell.

Plaintiffs claimed they should have received a higher rate of commission based on the terms of their employment agreement. Consequently on remand, the trial court must now make additional findings and then determine whether these commissions should have been paid, prior to the assignment, at the rate of 1 % or higher. The trial court must also decide whether Pozan permitted the corporation to avoid the payment of any amount.

Andrica Metals & Macomb Steel

The purported employment agreement signed in 1999 by Pozan as corporate president provided that plaintiffs would receive commissions "as of July 1, 1999, on Andrica Metals and Macomb Steel." Eric Martell testified that GST received payment for invoiced materials delivered to Andrica Metals and Macomb Steel after July 1, 1999. He also testified that, even though these payments from Andrica Metals and Macomb Steel were received by GST during 2000 and before May 7, 2001, GST did not pay any commissions to plaintiffs for those completed sales, contrary to the terms of the 1999 employment agreement.

22

Based on the undisputed documents of record, we conclude plaintiffs' evidence established the commissions that would have resulted from invoices paid by Andrica Metals and Macomb Steel arose between July 1999 and May 1, 2001. On remand, the trial court must make additional findings and then determine whether the employment agreement required the payment of these accrued commissions and, if required, determine the rate of payment.

## IM Steel

It is significant to understand, based on this record, that debt arising out of business conducted by IM Steel was never subject to the assignments for the benefit of creditors because IM Steel was incorporated after the date of the assignment. Therefore, we conclude the date of the assignment has no bearing on whether IM Steel or Pozan should have compensated plaintiffs for some portion of the $1,987.73 in commissions claimed by plaintiffs.

Nonetheless, defendant's Exhibit 44-15 validates plaintiffs' contention that after IM Steel was incorporated in May, 2001, plaintiffs earned commissions during their first month of employment with IM Steel in the amount of $1,987.73. The same exhibit shows that plaintiffs were entitled to receive accrued commissions from paid invoices on their first month of sales in the amount of $1,053.95.

However, defendant's Exhibits 43-4 and 44-13 proved that Pozan signed a check issued to Ashley Consultants, dated July 13, 2001, for first month commissions in the amount of $1,053.95. Defendants' Exhibit 44-15 also showed that IM steel issued another payment to plaintiffs in the amount of $472.71 "to clear acct."

Consequently, we agree that the evidence contained in this record demonstrates IM Steel compensated plaintiffs for these sales as required by the Act, and we affirm the trial court's

23

ruling in favor of IM Steel.

## Successor Status

When before the trial court and also on appeal, plaintiffs argue that IM Steel conducted the same business operations as GST by selling steel plate and using the very same equipment, formerly owned by GST and Belson, which continued to be housed at the same previous location. Based on this evidence, plaintiffs asserted that IM Steel was merely a continuation of the management, personnel, customers, and equipment of GST and Belson. Plaintiffs claimed IM Steel, as a successor corporation, should be required to pay the outstanding commissions, if any, owed by GST and Belson from IM Steel's corporate income. Pozan and IM Steel maintained IM Steel was an independent, newly created operation. The trial court agreed with IM Steel's position. We review the court's decision using a manifest weight of the evidence standard of review. *Eychaner v. Gross*, 202 Ill. 2d at 251-52.

In order to decide whether IM Steel was simply a continuation of a preexisting corporation or a successor corporation, the trial court was required to consider certain facts according to case law. See *Vernon v. Schuster*, 179 Ill. 2d 338 (1997); *People ex. rel Donahue v. Perkins & Will Architects, Inc.*, 90 Ill. App. 3d 349 (1980). These cases provide that the court must focus upon and determine whether there is a common identity of officers, directors, and stock between the selling and purchasing corporation. *Vernon v. Schuster*, 179 Ill. 2d at 346-47.

Here, the record shows a common identity of ownership did not exist between GST, Belson and IM Steel. IM Steel was held entirely by Pozan, while the other corporations were held by additional shareholders who maintained the controlling interest in comparison to Pozan's shares. After hearing the evidence, the trial court found IM Steel did not qualify as a

24

successor corporation. The record shows all three corporations were not held entirely by the same shareholders or managed by all of the same officers. Consequently, the trial court's finding was not contrary to the manifest weight of the evidence and must be affirmed based on our standard of review.

Improper Deductions

Now, we turn to the court's determination that "[p]laintiffs' failure to receive claimed compensation was not due to the acts of IM Steel or Pozan but instead were due to economic factors and the actions and decisions of the lender of GST and the [*sic*] Belson." Again, a manifest weight of the evidence standard of review applies. *Eychaner v. Gross*, 202 Ill. 2d at 251-52.

The parties agree that after the assignment, plaintiffs received only two checks from the trustee. Plaintiffs alleged these checks, in the amounts of $5,462 and $3,660.60, should have been issued in the amounts of $11,462.88 and $12,160.60, respectively, and should not have been reduced by $14,500.

The evidence of record reveals that according to Martell, "Marc" directed the first $6,000 deduction for parts left in the warehouse. When describing his role after the assignment, Pozan testified, "I gave him [trustee] advice on who should get paid, if anyone[,] after the assignment, and for what reason, such as Pat and Scott." Defendant's Exhibit 43-12 also contains a handwritten query written by Martell after the assignment, asking Pozan whether IM steel should scrap the parts rejected by Schaeff, Inc. There is also another handwritten notation dated July 3, 2001, signed by "Marc." This note, which Pozan testified that he wrote, informed plaintiffs that the cost or loss generated by Schaeff, Inc.'s decision to reject the burn parts

25

purchased from IM Steel was now plaintiffs "problem." In addition, Pozan's note stated that if GST took the rejected materials as scrap, the balance of the cost to IM Steel "comes off" plaintiffs' commissions and added, "we talked about this already."

When asked during his testimony whether defendants' Exhibit 43-12 showed that Pozan did not pay plaintiffs' commission, Pozan stated "I think so, yes. It wasn't I didn't pay them their commission - well, I guess it was. This is an IM thing, yes." During his testimony, Pozan stated the note was intended to inform Ashley of "my decision on what to do." Consistent with Pozan's "decision on what to do," on July 20, 2001, the trustee issued plaintiffs a check for GST and Belson commissions reduced by $8,500, from $12,160.60 to $3,660.60.

This court is bound by the trial court's determination that Pozan was a credible witness. Therefore, Pozan's uncontradicted testimony that he alone decided to deduct the cost of the rejected IM Steel burn parts from plaintiffs' GST commissions, links Pozan's conduct to the $8,500 deduction which was mirrored in the commission check issued on July 20, 2001. Based on Pozan's own testimony and the records of GST, we conclude the trial court's finding that the failure to pay compensation was not attributable to Pozan was contrary to the manifest weight of the evidence, and must be set aside.

The trial court also found that economic factors and the actions of the lender solely attributed to plaintiffs' failure to receive unpaid commissions. However, with the exception of the Manitowoc commissions, the failure to pay all other claimed commissions involved disputes related to the purported 1999 employment agreement between plaintiffs and GST. Some commissions were paid at 1 % while sales to Andrica Metal and Macomb Steel did not result in payment of any commissions. In other situations, some cumulative monthly commissions,

26

based on invoices paid before the assignment, were reduced by amounts related to rejected burn parts or shortpaid invoices resulting from transactions after the assignment.

Nonetheless, the record reveals that the failure to pay the disputed commission amounts, still at issue following remand, stem from issues arising from the purported employment agreement and did not result from the actions of the lender or other economic factors as the court determined. Based on the record, we conclude that the trial court's finding that the corporations' failure to pay the disputed commissions were related to the lender's actions and the financial frailty of each corporation is against the manifest weight of the evidence. Consequently, this determination is set aside.

### Fraud

Plaintiffs request this court to review the trial court's finding that Pozan was a credible witness and ultimate conclusion that Pozan did not intend to defraud the employees or the creditors of GST and Belson. Again, we begin by focusing on the trial court's order which found that "[p]laintiffs failed to prove defendants engaged in any activity with a fraudulent or ulterior motive."

Fraud becomes an issue when a criminal offense for violating the Act has been alleged under section 14 (820 ILCS 115/14(a) (West 2000)). Yet, fraud is not at issue when applying sections 5 and 13 of the Act. 820 ILCS 115/5, 13 (West 2000). Under the provisions of the Act at the heart of plaintiffs lawsuit, the Act neither requires an employee to demand the unpaid wages, nor requires a fraudulent purpose for the employers who fail to pay the required compensation in a timely fashion under the Act.

Therefore, it is not necessary to address the trial court's finding with regard to fraud.

27

Next, we turn to the court's finding that, " Plaintiffs' failure to receive claimed compensation was not due to the acts of IM Steel or Pozan but instead were due to economic factors and the actions and decisions of the lender of GST and the [*sic*] Belson."  Again, a manifest weight of the evidence standard of review applies to this finding.  *Eychaner v. Gross*, 202 Ill. 2d at 251-52.

The Act and the Impact of the Assignments

Plaintiffs' submit the Act cannot be "trumped" by a voluntary assignment for the benefit of corporate creditors and, therefore, the assignment in this case does not supersede the mandates of the Act.  Consequently, even in the absence of fraud, plaintiffs argue Pozan may be personally responsible, according to section 13 of the Act, for unpaid compensation due to his actions both before and after the date of the assignment.

In their brief, defendants do not address plaintiffs' argument regarding whether the assignment for the benefit of creditors in this case "trumps" the Act.  Instead, defendants reiterate that, after the date of the assignment, a third party made the corporate decisions and further allege that third party could not pay plaintiffs due to insufficient corporate funds.

We recognize that a corporation's inability to pay employees eliminates any possibility that the employer acted wilfully when failing to compensate employees, thereby negating liability under the Act.  See *Stafford v. Puro*, 63 F. 3d 1436, 1441 (7th Cir. 1995).  However, the trial court did not specifically reach this issue, just as the court did not determine whether plaintiffs were employees.  These issues have yet to be considered by the trial court and must be addressed by that court on remand, not by this court on appeal.

Thus, we direct our focus to the only question of law that we have been asked to decide

28

in this appeal, that is, whether a voluntary assignment supersedes the Act or vice versa. Since this issue involves statutory interpretation, we review *de novo*. *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 235 (2005). "The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature." To do so, a reviewing court must examine the language of the statute, which is the most reliable indicator of the legislature's objectives in enacting the law and give undefined words their plain and ordinary meaning. *Price v. Philip Morris, Inc.*, 219 Ill. 2d at 242-43.

In *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d 668 (2004), *aff'd* 217 Ill. 2d 101 (2005), the fourth district appellate court was also called upon to consider the language of section 13 of the Act. In that case, after the involuntary seizure of assets by the secured creditor pursuant to foreclosure, the bank took possession of the business facility and terminated all employees. The terminated employees were not compensated for vacation and severance pay after the seizure. *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d at 671, *aff'd* 217 Ill. 2d 101 (2005).

The fourth district appellate court held that, even though the secured creditor in that case seized the employer's business assets, the seizure did not necessarily relieve the corporate employer in that case from its duty to provide timely payments to employees pursuant to section 5 of the Act. *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d at 676, *aff'd* 217 Ill. 2d 101 (2005). When subsequently reviewing and then affirming the fourth district's decision, our supreme court was not asked to consider or to set aside the lower court's ruling which found the obligation to pay terminated employees according to the Act continued after the seizure of corporate assets. See *Andrews v. Kowa Printing Corp.*, 217 Ill. 2d 101 (2005).

29

Based on the plain language set forth in section 13 of the Act and the rationale employed by the fourth district in *Kowa*, we conclude the voluntary assignment of assets by the corporations in this case did not *automatically* relieve the corporate employers in this case from their duty to compensate both terminated and current employees of each corporation under the provisions of the Act. Further, we hold that when a corporate officer enters into a voluntary assignment for the benefit of creditors, the corporation's obligation to pay wages survives. This holding does not dictate the result in the circuit court but addresses the question of law which the trial court misapprehended.

While the date of the assignment may be one factor to be considered on remand, equally important is a determination of whether the corporate officer continued to have influence on corporate affairs after that seizure of corporate assets. *Andrews v. Kowa Printing Corp.*, 217 Ill. 2d at 112-14. In fact, in *Kowa*, after considering the evidence presented in the trial court, our supreme court focused on the fact that Kowa was not allowed by the bank to have any role in the corporate affairs after the seizure and that, while he was still in control of the corporation, Kowa did not knowingly violate the Act. On this basis, the fourth district appellate court's decision which set aside the trial court's findings in that case was affirmed. *Andrews v. Kowa Printing Corp.*, 217 Ill. 2d at 118.

In this case, the trial court's findings were premised on the view that the voluntary assignment eviscerated Pozan's ability to influence corporate decisions beginning with the date of the assignment. Consequently, the trial court did not go on to consider any of Pozan's acts which occurred after the date of the assignment. We remand the matter to the lower court to follow our supreme court's guidance in *Kowa*, by considering Pozan's conduct before and after

30

the assignment when deciding the question of liability under section 13 of the Act.

CONCLUSION

We affirm the court's decision that plaintiffs' evidence did not establish they were entitled to $74,028.76 for commissions from cancelled sales to Manitowoc Cranes. We also affirm the trial court's decision finding that plaintiffs did not meet their burden of proof to show IM Steel was either a successor corporation or a continuation of GST and Belson. We agree with the court's determination that plaintiffs' evidence did not establish that IM Steel failed to pay commissions to plaintiffs for sales on behalf of IM Steel during May and June of 2001.

We reverse that portion of the trial court's order that determined Pozan could not be held responsible for any portion of commissions based on sales to Andrica Metals, Macomb Steel, United Fixtures, Central Power, and various others because those commissions accrued after the date of the assignment. Further, we reverse that portion of the court's order finding that the evidence established economic factors alone, rather than the conduct of Pozan, resulted in the failure to pay any amount of the accrued commissions in this case. Finally, we remand the matter to the trial court to consider whether plaintiffs were, in fact, employees of GST and Belson, and to decide the other issues presented by plaintiffs' third amended complaint consistent with this opinion.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

O'BRIEN, J., concurs.

JUSTICE SCHMIDT, concurring in part and dissenting in part:

The trial court, after a complete trial, found that it did not have to make a decision or

31

finding as to whether the plaintiffs were employees of GST. This was because the trial court made the factual finding that Mark Pozan did not knowingly permit the unlawful withholding of plaintiffs' commissions. That finding was supported by the evidence. Whether the evidence would also support the opposite conclusion is irrelevant. We should not retry this case here in the appellate court. I would affirm the trial court in its entirety and, therefore, respectfully dissent from the portions of the majority opinion that reverse and remand for further proceedings.