# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

***Elsener v. Brown*, 2013 IL App (2d) 120209**

---

| | |
|---|---|
| Appellate Court Caption | JAMES ELSENER, Plaintiff-Appellee, v. ROY BROWN, Defendant-Appellant (Brown Business Ledger, LLC, Defendant). |
| District & No. | Second District<br>Docket No. 2-12-0209 |
| Filed | September 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In plaintiff's action to recover under his employment contract with the company created following plaintiff's sale of the company he created, the trial court's judgment finding that defendant, the president of the successor company, was personally liable in his capacity as president of the successor was affirmed, notwithstanding the fact that defendant's headquarters were in Ohio, where he was also the chief executive officer of the parent company of the successor, and he only came to Illinois briefly to discuss the purchase of plaintiff's company, since he had sufficient contacts with Illinois to warrant requiring him to answer plaintiff's complaint; furthermore, he failed to raise the claim that he was not liable under the Wage Payment and Collection Act in the trial court, he was "in Illinois" for purposes of that Act, and pursuant to the contractual provision for severance pay, the trial court properly found defendant permitted a violation of the Act. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 10-L-172; the Hon. Patrick J. Leston, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Roy Brown, of Cincinnati, Ohio, appellant *pro se*.

David H. McCarthy III, of Law Offices of David H. McCarthy III, of Naperville, for appellee.

Panel

JUSTICE BIRKETT delivered the judgment of the court, with opinion.

Justices Hutchinson and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1   Defendant, Roy Brown, appeals from the trial court's judgment finding him personally liable on an employment contract signed by plaintiff, James Elsener, and defendant in his capacity as president of Brown Business Ledger, LLC (BBL). For the following reasons, we affirm.

¶ 2                            I. BACKGROUND

¶ 3   Plaintiff, a former employee of BBL, filed a three-count complaint in February 2010 against both BBL and defendant. Plaintiff alleged that, on June 2, 2008, he signed a contract with BBL for a three-year term of employment, that he was terminated without cause on August 18, 2009, and that his contract entitled him to his remaining compensation for the three-year term. Plaintiff also sought attorney fees and prejudgment interest. In counts I and II, plaintiff brought claims under the Illinois Wage Payment and Collection Act (Wage Act) (820 ILCS 115/1 *et seq.* (West 2010)) against both BBL and defendant. Plaintiff alleged that defendant was individually liable under the Wage Act because he "controlled [BBL's] financial decisions" and "knowingly refused to allow [BBL] to pay [plaintiff] the compensation owed him ***, *** thereby knowingly permitt[ing] [BBL] to violate the [Wage Act]." Count III, which apparently was brought against BBL alone, alleged breach of contract.

¶ 4   Defendant subsequently moved to dismiss, for lack of personal jurisdiction, the counts against him. On April 30, 2010, while the motion to dismiss was pending, BBL and its parent corporation, Brown Publishing Company (BPC), filed a bankruptcy petition in federal court. On May 3, BBL asserted to the trial court that the proceeding before it was automatically stayed pursuant to section 362(b)(21) of the Bankruptcy Code (11 U.S.C. § 362(b)(21) (2006)). On May 4, the trial court stayed the proceedings against BBL alone. On October 11, BPC and BBL moved the bankruptcy court for an order enforcing the automatic stay against all proceedings in the trial court. Plaintiff responded that the stay did not apply to the proceedings against defendant. On November 30, the bankruptcy court entered a stipulated order lifting the stay in part and permitting plaintiff to "proceed with the Illinois [a]ction solely against defendant Roy Brown." The order further provided: "[Plaintiff] has not filed,

will not file, and forever waives and releases his right to file a proof of claim against [BPC and BBL] and each of them and their respective estates."

¶ 5    On June 25, 2010, the trial court denied defendant's motion to dismiss for lack of jurisdiction. Plaintiff later moved for summary judgment, which was denied.

¶ 6    The trial court conducted a bench trial in August 2010. Defendant renewed his jurisdictional motion. Plaintiff and defendant were the sole witnesses at trial.

¶ 7    Plaintiff testified that, in April 1993, he commenced publication of "The Du Page Business Ledger." Later, he changed the name to "The Business Ledger" (The Ledger). Plaintiff was sole owner and manager of The Ledger, which was headquartered in Naperville. In the spring of 2008, BPC expressed interest to plaintiff about purchasing The Ledger. BPC was a publishing conglomerate that owned multiple publications throughout the United States. BPC was headquartered in Ohio, with offices in Cincinnati and Tipp City. Officed in Cincinnati were defendant, BPC's president and chief executive officer; Joe Ellingham, vice president and chief financial officer; and Joel Dempsey, vice president and general counsel. In May 2008, defendant traveled to Illinois and met with plaintiff in Naperville to discuss the sale of The Ledger. Subsequently, on May 26, 2008, defendant sent on behalf of BPC a letter of intent to purchase The Ledger for $900,000 cash plus a three-year contract of employment for plaintiff. The sale of The Ledger closed in June 2008. Contemporaneously, BBL was formed in Illinois to operate The Ledger. BBL became a wholly owned subsidiary of BPC. Admitted into evidence were the articles of organization for BBL, showing that it was an Illinois limited liability company with its principal place of business in Naperville. Defendant and Dempsey were appointed BBL's president and vice president, respectively. Consistent with the articles of organization, BBL's business offices were in Naperville.

¶ 8    On June 2, 2008, an executive employment contract was entered into between plaintiff as "Employee" and BBL as "Employer." Signing for BBL was defendant, designating himself as the company's president. The contract installed plaintiff as publisher of The Ledger, with an employment term of three years and a base salary of $85,000 to be paid in biweekly installments. Article 3.1 of the contract specified two means by which BBL could unilaterally terminate plaintiff's employment prior to the end of the three-year term. BBL could terminate for "cause" (referred to as "Termination for Cause") or "for any other reason, whatsoever, with or without cause, at the sole discretion of [BBL]" (referred to as "Involuntary Termination"). Article 3.1(i) stated: "It is expressly acknowledged and agreed that the decision as to whether 'cause' exists for termination of the employment relationship by Employer is delegated to Employer's President." Article 6.1 imposed a mandate of noncompetition that would bind plaintiff "[d]uring the term of this Agreement and for a period of one (1) year after termination of this Agreement, whether terminated by cause or otherwise." Article 3.5 provided:

"Upon an Involuntary Termination of the employment relationship by *** Employer *** prior to expiration of the Term, Employee shall be entitled, in consideration of Employee's continuing obligations hereunder after such termination (including, without limitation, Employee's non-competition obligations), to receive his pro rata salary

-3-

through the date of such termination plus the severance amount set forward in Exhibit A."

Exhibit A provided, with respect to "Severance," that "Employee shall be entitled to the remaining amount of his base salary [$85,000] through expiration of the Contract Term if he is terminated not for cause." Article 9 stated that the contract "shall be subject to and construed under the laws of the State of Illinois."

¶ 9       Plaintiff testified that his responsibilities after the sale were much the same as they were before. Plaintiff was responsible for, *inter alia*, "sales" and "profitability." Payroll operations were moved to Tipp City, and subsequently plaintiff received his biweekly salary payments from there. During plaintiff's tenure at BBL, "financial statements and reporting were in transition to go to Ohio." Ellingham was plaintiff's day-to-day "direct report" at BBL.

¶ 10      According to plaintiff, BBL began to incur losses in the fall of 2008 because of the national economic recession. Plaintiff and Ellingham came under pressure to cut costs at BBL, and plaintiff made proposals to improve the budget. The losses continued into 2009. Plaintiff acknowledged, based on financial statements produced by BBL for 2009, that BBL was running a year-to-date loss of $55,946 as of May 31, 2009.

¶ 11      Plaintiff testified that, on June 24, 2009, he e-mailed Ellingham a financial update for BBL. The update forecast a cumulative loss of $116,784 for BBL by August 2009. Plaintiff copied defendant on the e-mail. About an hour later, defendant wrote plaintiff directly: "These expenses are WAY too high for the environment. I am not going to allow losses to mount. Please provide a cost reduction plan to get to break even in July." Defendant copied Ellingham on the message. According to plaintiff, this was his first direct communication from defendant during plaintiff's time at BBL. On the evening of June 24, 2009, plaintiff sent defendant and Ellingham a cost-savings plan that proposed, *inter alia*, that all accounting work be moved to Tipp City and that all salaries (but plaintiff's) be cut by 20%. Plaintiff noted that the "largest salary" was his and that there were two years remaining on his employment contract. Plaintiff asked, "Would you consider buying me out? Perhaps we can find a win-win." Unbeknownst to plaintiff, however, defendant had earlier that day e-mailed Ellingham a note that read: "Elsener needs to be gone ASAP. Need to breakeven [*sic*] here and in GSA." Ellingham's e-mailed reply was: "Agreed."

¶ 12      Plaintiff testified that, on August 17, 2009, Ellingham phoned to tell him that BPC had decided to change publishers for The Ledger, that plaintiff was terminated, and that his replacement would begin in two days. Plaintiff asked Ellingham about the "severance plan" in plaintiff's contract, and Ellingham replied that it was "something *** to discuss with Mr. Brown."

¶ 13      Plaintiff subsequently addressed three messages directly to defendant. First, on August 17, plaintiff e-mailed defendant asking how he "plan[ned] to proceed concerning my employment contract." Plaintiff received no response. On August 23, plaintiff mailed defendant a letter reminding him of the August 17 note. Plaintiff also noted that he had yet to receive written confirmation of his termination. On August 26, Ellingham sent plaintiff a letter confirming that his last day was August 18. Still having received no word on his severance payment, plaintiff retained counsel. On December 31, plaintiff's counsel sent

defendant a letter by registered mail demanding payment of $156,061.12, representing plaintiff's salary for the balance of the three-year contract term. Plaintiff testified that he did not know whether his counsel ever received a response to this letter. Plaintiff received no payment from BBL after August 18. In February 2010, plaintiff filed suit against defendant and BBL.

¶ 14    Plaintiff testified that, after he was terminated, publication of The Ledger continued with the same frequency as before. Publication even continued after BPC and BBL filed for bankruptcy in April 2010. Plaintiff admitted that he filed no claim against BBL or BPC in bankruptcy court. The reason he filed no claim, and in fact agreed to release BBL from any "proof of claim" (according to the November 30, 2010, stipulated order) was that he did not want his state court action "sucked into" the bankruptcy proceeding.

¶ 15    Plaintiff acknowledged that, in the event of an "Involuntary Termination" as defined in the employment contract, he had a one-year noncompetition duty. Plaintiff also acknowledged that his "continuing obligation [not to compete] would be met with a continuing payment by [BBL]." Plaintiff assumed that, if BBL were unable to meet its payroll, BPC would cover the expense because it owned BBL. Plaintiff was unaware, however, of any "guarantee made by [BPC] to cover the losses of [BBL]." Asked if had "any evidence that Mr. Brown knowingly refused to pay [the] severance," plaintiff answered, "No, I do not. Mr. Brown never responded to anything."

¶ 16    Defendant testified that he became president and chief executive officer of BPC in January 2000 and president of BBL in May 2008. Defendant remained in those positions until his termination at some point during the bankruptcy proceedings. BPC, defendant recounted, was founded by his grandfather in 1920. Eventually, BPC grew to own 10 separate subsidiaries publishing over 90 newspapers. According to defendant, BPC funded the operations of these subsidiaries but was not obligated to do so. In a declaration that defendant filed in bankruptcy court in April 2010, which plaintiff introduced into evidence, defendant stated that he was "currently responsible for all functions of [BPC's] management" and, in his "capacit[ies] as [BPC's and BBL's] President and Chief Executive Officer, [was] familiar with [BPC's and BBL's] books and records, financial affairs, business[,] and operations."

¶ 17    Defendant claimed that he is a citizen of Ohio and has never lived or voted in, or paid taxes to, Illinois. Defendant's sole visit to Illinois in connection with his work for BPC was the meeting with plaintiff in 2008 to discuss the purchase of The Ledger. Defendant never traveled to BBL while he was president of that company.

¶ 18    Defendant stated that Dempsey drafted plaintiff's employment contract in conjunction with plaintiff's counsel. Defendant did not know who drafted which provisions. Defendant denied that plaintiff's severance was to be paid in a single sum following the termination of his employment. Rather, the intent was that plaintiff would be paid "over the period of [the] noncompete period." This was necessary, defendant explained, to enforce the noncompetition requirement.

¶ 19    Defendant testified that, shortly after BPC purchased The Ledger and BBL was formed, the national economy declined. BPC experienced a sharp decline in revenue, necessitating

"drastic cost reductions" throughout the company and its subsidiaries. On June 24, 2009, defendant wrote plaintiff an e-mail directing him to devise a plan for BBL to balance its budget by the end of the next month. Defendant testified that this was his first communication to plaintiff since the letter of intent in May 2008. Defendant acknowledged that, later in the day on June 24, he directed Ellingham to terminate plaintiff's employment. Asked about article 3.1 of the employment contract, which "delegated" to him the determination of whether a unilateral termination of plaintiff's employment was for cause, defendant replied that the authority was vested in him but that "the call was counsel's," namely Dempsey's, because "that's why we have a general counsel." Defendant could not recall any conversation he had at BBL or BPC as to whether cause existed for plaintiff's termination. Defendant would have relied on Dempsey to review the parties' respective obligations under the employment contract and determine whether cause existed. Defendant also testified that, when a publisher was terminated, the "point person" was Ellingham, who along with Dempsey would handle any "claims or legal issues [that] arose out of those terminations." According to defendant, he handled severance issues concerning only BPC personnel who reported directly to him.

¶ 20       Defendant testified that, when he received plaintiff's August 17 e-mail query about the employment contract, he discussed it with Dempsey and Ellingham because "it was effectively their responsibility to resolve [the issue] on the contract side." All defendant recalled was that he directed Dempsey and Ellingham to "resolve it, if we had the ability." Defendant agreed that "basically the issue landed on [his] desk and [he] sent it downstream to Mr. Dempsey and to Mr. Ellingham." Defendant had no communication with Dempsey or Ellingham about the severance issue until defendant received plaintiff's December 31, 2009, demand letter. Defendant assumed from the letter that plaintiff had not been paid his severance. As with the August 17 e-mail, defendant forwarded the demand letter to Dempsey and Ellingham and directed them to resolve it. Defendant testified: "[I]t was not something that I could resolve. I needed those guys to resolve it." Defendant himself made no decision whether to pay plaintiff his severance.

¶ 21       Defendant described the financial condition that BPC was in when plaintiff was terminated. In the summer of 2009, BPC was losing $300,000 to $400,000 each month. There were two credit liens on BPC. BPC owed the first-priority lienholder $70 million and the second lienholder $25 million. On April 13, 2009, the first lienholder declared BPC in default. On June 5 of that year, the second lienholder declared BPC in default. Defendant characterized the defaults as "the beginning of the end of [his] control over the affairs of the company." On July 20, BPC signed, on behalf of itself and all its subsidiaries, a forbearance agreement with the first lienholder. Section 3(a) of the agreement required BPC to

   "cooperate with and provide prompt and complete access to the Lenders' financial advisors, including Huron Consulting Services, LLC (each, an 'FA'), in order to allow such financial advisor(s) to assess and monitor Borrowers' operations, financial position, cash flow and such other items as any Lender shall require, including but not limited to access to all of Borrowers' books and records. Each FA shall be permitted to review all financial reports to be delivered by the Borrowers ***."

The agreement specified that it would terminate July 31, 2009, or earlier in case there were

further defaults. In defendant's words, the agreement allowed Huron to "come in and effectively give marching orders to [BPC's] management on what needed to be done." Subsequently, Huron came to BPC and began "looking over [its] shoulder." Huron's

> "job [was] to come in, do a full assessment of the company, interact with publishers directly, employees directly, *** have access to all of the company, and then to monitor and suggest and direct ultimately aspects of the operations of the company, if not ultimately the operations."

According to defendant, Huron "interacted directly with just about everybody at [BPC] but [him]."

¶ 22    Defendant testified that, on August 3, 2009, BPC received notice that the initial period of the forbearance agreement had expired and that the first lienholder had declined to renew it. As of that date, according to defendant, the first lienholder could at any time accelerate the debt and liquidate BPC's assets. As it happened, the first lienholder relented for several more months. (Apparently, even after the expiration of the forbearance agreement, Huron was still reviewing BPC's financial activities.) After receiving the August 3 notice, BPC retained bankruptcy counsel and, on its advice, hired its own financial consultant, Mesirow Financial, to speak with Huron as BPC's representative. With the retention of Mesirow, defendant was "frozen out"; he had "no control to pay anything at that point. It had to be agreed. And without, frankly, [his] input having much, if any, import." Ellingham became the point of contact for Mesirow, and defendant was not "access[ed] *** at all in that process." Plaintiff's claim for severance became "one of just a lot of potential claims that ultimately materialized."

¶ 23    Defendant testified that, when he received plaintiff's December 2009 demand letter, he had no knowledge of whether BPC could pay plaintiff his severance:

> "I didn't know if we had the money and I didn't know if we were going to file bankruptcy the next day and I didn't know what Huron and the banks and/or Mesirow might allow at any point because, frankly, Mr. Dempsey and Mr. Ellingham were there [*sic*] direct points of contact. And I don't know why it was not ultimately paid, but I assume someone made a determination in that connection not to pay it at that time. I directed them to resolve it."

Defendant claimed that it was not until plaintiff filed suit in February 2010 that defendant learned that BPC had made a decision not to pay plaintiff his severance.

¶ 24    Defendant acknowledged that, between plaintiff's termination and the April 2010 bankruptcy filing, "the ongoing business expenses [of BBL] were being paid." Specifically, "decisions were being made *** as to who–which creditors were going to be [*sic*] receive how much and when." According to a "summary of schedules" filed in the bankruptcy court, BPC had assets of $951,073 and liabilities of $101,504,725.81. On May 5, 2010, the bankruptcy court entered an order finding that it was "essential to [BPC's and BBL's] continued viability" that they "pay their employees and otherwise finance their operations." The court therefore permitted BPC and BBL to use their cash collateral in keeping with their prospective 13-week budget, which allocated an average of $449,000 per week for employee compensation. Also pursuant to that order, a "chief restructuring officer" was appointed for

BPC. His function, defendant described, was to "administer the company while in bankruptcy." At this point, defendant claimed, he "really didn't have [a function]" at BPC. Eventually, defendant was let go from BPC. He had a severance agreement with BPC, but never received any such payments.

¶ 25     Defendant acknowledged that BBL replaced plaintiff with a new publisher and that publication of The Ledger continued even after BPC and BBL filed for bankruptcy. The replacement improved BBL's financial status, though the company still operated at a loss.

¶ 26     In closing argument, defendant's threshold contention was that the trial court lacked personal jurisdiction over him because he was neither "a resident, voter, taxpayer, worker, [nor] property owner in Illinois." Defendant also relied on the "fiduciary shield" doctrine recognized by the supreme court in *Rollins v. Ellwood*, 141 Ill. 2d 244 (1990). Second, defendant claimed that, as he was a resident of Ohio, the Wage Act lacked the extraterritorial reach to bind him. Third, citing *Andrews v. Kowa Printing Corp.*, 217 Ill. 2d 101 (2005), defendant asserted that, even if the Wage Act applied to him, he was not personally liable on the severance obligation because he did not knowingly permit BBL's failure to make the payment. Defendant claimed that it was reasonable for him to delegate the severance issue to Ellingham and Dempsey, and that he was not privy to the ultimate decision whether to pay plaintiff. Notably, defendant did not dispute at trial that plaintiff's termination was not for cause and that, at least by the letter of the employment contract, plaintiff was owed severance pay.

¶ 27     For his fourth argument, defendant asserted that, if he were found liable under the Wage Act, the trial court should interpret the employment contract as requiring that the severance payment be rendered not as a single sum but as biweekly installments for the balance of the three-year term. The timing was important, defendant proposed, because, while that three-year term was yet unexpired, BPC and BBL filed for bankruptcy and, consequently, defendant "ha[d] no control over anything" and so could have no further Wage Act liability. Therefore, defendant argued, he was liable at most for $60,000, the total of the installments due at the time of the bankruptcy filing. Finally, defendant argued that any damages award against him must not include interest or attorney fees, as plaintiff waived such awards pursuant to article 3.5 of the employment contract.

¶ 28     The trial court found for plaintiff, explaining its reasons on the record. First, the court found that it had personal jurisdiction over defendant:

"Mr. Brown clearly did business in Illinois as a director and officer of an Illinois company. The contract was formed in Illinois. The negotiations took place in Illinois. All services under the contract were rendered in Illinois, or virtually all services, and the contract has been construed pursuant to Illinois law."

¶ 29     Next, the court held that defendant, as president of BBL and BPC, was ultimately responsible for seeing that BBL's contractual obligations were met, and that the responsibility remained with him despite his efforts to delegate:

"[Defendant] cannot divest himself of responsibility by handing the piece of paper to somebody else in his immediate employ and saying take care of this. It's his duty under [the Wage Act] to take care of it. It was no one else's duty. It is his duty and his alone as

-8-

provided in [the Wage Act].

\*\*\*

He personally made the offer of employment. He personally signed the employment agreement. He personally retained the right to terminate for cause. He received the e-mail demand. He personally received the demand letter in December [2009]. Although I think \*\*\* that date [of December 31, 2009,] is less significant because I believe the cause of action arose on August 17[, 2009]. He signed the various pleadings and the statements in the bankruptcy court indicating that he was responsible for all the function of the management of this particular company. Apparently, \*\*\* he was able to pay various financial obligations of this particular company. He was the man in charge and made the decision not to pay [plaintiff]. It was his responsibility to see that that was paid under [the Wage Act]."

¶ 30 The court also refused to accept that the funds were not available to pay plaintiff:

"You have an income statement that was presented into evidence showing that the company was losing money. There is no balance sheet. There is no indication of how much was in the bank account. There is no indication of how much was left on any lines of credit. There was no indiction of any cash on hand. We know that for a period of months until April the following year[1] they stayed in business. They paid other employees and they paid some creditors, presumably as indicated by the financial statement[;] they simply did not pay [plaintiff], and he was required to be paid under the statute.

\* \* \*

I note the forbearance agreement \*\*\* does not forbid payments to [plaintiff], which had been previously earned. Until the time of bankruptcy, it does not appear to me that the banks or creditors were running the company to the exclusion of Mr. Brown, which [was] the case in [*Andrews*]."

¶ 31 The court found that it was only after BPC and BBL filed for bankruptcy that control of those companies was taken away from management. Before that time, the obligation to pay severance "remained with the person who was calling the shots and that person was Mr. Brown." The court also agreed with plaintiff that the employment contract called for a lump-sum severance payment upon an "Involuntary Termination." Accordingly, the court entered judgment for plaintiff for $158,696.12 plus costs. The court also granted plaintiff leave to file a fee petition. Plaintiff subsequently filed a petition requesting both attorney fees and prejudgment interest. While that petition was pending, defendant filed a posttrial motion reasserting his jurisdictional objection and challenging the application of the Wage Act to him personally. Defendant also disputed the fee and interest claims as "forbidden by the parties' contract." The court awarded plaintiff $48,921.25 as attorney fees and $15,847.87 as prejudgment interest. In accord with the bankruptcy stay, which had been lifted strictly as to the action against defendant, no judgment was entered against BBL.

---

[1]The court may have meant 2010 or even 2011.

¶ 32    Defendant filed this timely appeal.

¶ 33                              II. ANALYSIS
¶ 34                          A. Personal Jurisdiction
¶ 35    We address first defendant's contention that the trial court lacked personal jurisdiction over him.

¶ 36    Personal jurisdiction is "the authority of the court to litigate in reference to a particular defendant and to determine the rights and duties of that defendant." *In re Possession & Control of the Commissioner of Banks & Real Estate of Independent Trust Corp.*, 327 Ill. App. 3d 441, 463 (2001). Where the trial court makes a jurisdictional determination based on facts adduced at an evidentiary hearing, we sustain the trial court's ruling unless it is against the manifest weight of the evidence. *Gaidar v. Tippecanoe Distribution Service, Inc.*, 299 Ill. App. 3d 1034, 1039 (1998). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 37    There are two types of personal jurisdiction: general and specific. *Aasonn, LLC v. Delaney*, 2011 IL App (2d) 101125, ¶ 14. General jurisdiction rests on the defendant's "continuous and systematic contacts with the state" and can be exercised even where the cause of action does not arise out of those contacts. *Id.* Specific jurisdiction does not require such extensive contacts, but the contacts that do exist must be the basis for the cause of action. *Id.* Section 2-209 of the Code of Civil Procedure (735 ILCS 5/2-209 (West 2012)) is known as the Illinois long-arm statute. Subsection (a) of section 2-209 "describes 14 grounds under which specific jurisdiction arises," while subsection (b) "describes 4 grounds under which general jurisdiction arises." *Sabados v. Planned Parenthood of Greater Indiana*, 378 Ill. App. 3d 243, 246 (2007). Jurisdiction lies under subsection (a) only with respect to "causes of action arising from [the] acts enumerated [in subsection (a)]." 735 ILCS 5/2-209(f) (West 2012).

¶ 38    The trial court did not identify the authority upon which it relied. Defendant argues that there is "only one possible basis" for jurisdiction under the long-arm statute, namely section 2-209(a)(12), which grants jurisdiction over a cause of action arising out of a defendant's "performance of duties as a director or officer of a corporation organized under the laws of this State or having its principal place of business within this State" (735 ILCS 5/2-209(a)(12) (West 2012)). Defendant denies that jurisdiction lies under subsection (a)(12). In his response brief, plaintiff relies on that subsection alone.[2] Arguing that the requirements of subsection (a)(12) were not met, defendant asserts that he had no contacts with Illinois as

_____

[2]Oddly, plaintiff does not rely on subsection (c), the catchall provision, which states that "[a] court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c) (West 2012). That provision "effectively collapses the jurisdictional inquiry into the single issue of whether a defendant's Illinois contacts are sufficient to satisfy federal and Illinois due process." *Russell v. SNFA*, 2013 IL 113909, ¶ 30.

president of BBL because he "never once traveled to Illinois on [BBL] business, took corporate action in Illinois, or directed anyone in Illinois to act adversely to plaintiff." He contends that "all of [his] actions, including those related to plaintiff's severance, took place in Ohio." We are not persuaded. Jurisdiction under subsection (a)(12) is based simply on acts done as an officer or director of a corporation organized under Illinois law or having its principal place of business in this state. The statute accords no significance to *where* those acts occur. Defendant was president of BBL, which was organized under Illinois law and headquartered here as well. Moreover, the conduct that forms the basis for plaintiff's cause of action is defendant's failure, in his capacity as president of BBL, to ensure that the company paid plaintiff the severance amount owed him under the employment contract. We hold that the elements of section 2-209(a)(12) were satisfied here.

¶ 39     This does not end our inquiry, for we must still determine whether the exercise of personal jurisdiction over defendant pursuant to section 2-209(a)(12) comported with due process principles under the Illinois and federal constitutions. See *Rollins*, 141 Ill. 2d at 275; *Hanson v. Ahmed*, 382 Ill. App. 3d 941, 943 (2008). "The purpose of the Illinois long-arm statute is to assert jurisdiction over nonresidents to the extent permitted by the due process clause." *Hanson*, 382 Ill. App. 3d at 943. "Thus, the reach of the long-arm statute may lie within or may touch, but cannot extend beyond, the bounds circumscribed by the requirements of due process." *Id.* Recently, in *Russell*, 2013 IL 113909, ¶ 32, our supreme court observed that there have been no recent published Illinois decisions "identifying any substantive difference between Illinois due process and federal due process on the issue of a court's exercising personal jurisdiction over a nonresident defendant." As the parties in the case did not claim any substantive difference between Illinois and federal standards governing personal jurisdiction, the court did not explore the issue further. Rather, the court proceeded as if the standards were indistinguishable. *Id.* ¶ 33. Since defendant likewise does not claim any substantive distinction between Illinois and federal standards, our analysis will be unitary. We determine whether defendant had " 'certain minimum contacts with [Illinois] such that maintenance of the suit there does not offend "traditional notions of fair play and substantial justice." ' " *Id.* ¶ 34 (quoting *Wiles v. Morita Iron Works Co.*, 125 Ill. 2d 144, 150 (1988), quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

¶ 40     Defendant relies on two cases as illustrating the boundaries of due process. The first is *Rollins*. Sylvester Rollins was stopped in Illinois for a traffic offense. After the stop was concluded, the police detained him on the mistaken belief that he was a fugitive from Maryland. After Rollins waived extradition to Maryland, John Ellwood, a Maryland police officer, transported him from Illinois to Maryland. At some point during the trip, Rollins told Ellwood that he was not the person whom the Maryland authorities wanted. After his arrival in Maryland, Rollins was released by a judge. He subsequently sued Ellwood in Illinois state court for the intentional torts of kidnaping, unlawful restraint, and conspiracy. *Rollins*, 141 Ill. 2d at 249-52.

¶ 41     The supreme court held that exercising personal jurisdiction over Ellwood in Illinois would offend due process. The court formally recognized the "fiduciary shield" doctrine as a part of due process protections. Specifically, the court considered it "unfair and unreasonable *** to assert personal jurisdiction over an individual who seeks the protection

and benefits of Illinois law, not to serve his personal interests, but to serve those of his employer or principal." *Id.* at 280. Applying the doctrine to the facts before it, the court said:

> "Ellwood entered into Illinois, and while in Illinois engaged in conduct giving rise to the present cause of action, solely in his capacity as a police officer acting for the Baltimore police department and the State of Maryland. The nature and quality of his actions in Illinois were defined and characterized by his status as a police officer employed by these entities. Because Ellwood's conduct in Illinois was a product of, and was motivated by, his employment situation and not his personal interests, we conclude that it would be unfair to use this conduct to assert personal jurisdiction over him as an individual. Also, we are not persuaded by the argument, raised by various sources, that asserting personal jurisdiction over an employee who acted in the scope of his employment is justified because the employee is serving his own financial interests when he performs the tasks imposed upon him by his employer. In practical terms, an employee, especially one in Ellwood's position, has little or no alternative besides unemployment when ordered to enter another State to carry out the wishes of his employer." *Id.* at 279-80.

¶ 42     Both the First District and the Fifth District Appellate Courts have distinguished *Rollins* in circumstances relevantly similar to the present case. In *People ex rel. Morse v. E&B Coal Co.*, 261 Ill. App. 3d 738 (1994), the State of Illinois sued both Edward Everly and E&B Coal Co., the Illinois mining corporation of which he was a director, for violations of an Illinois coal mining statute. The suit was based on actions Everly took as a director of E&B. (The opinion does not state where Everly resided at the time of suit, but evidently it was not Illinois.) The Fifth District rejected Everly's claim that the fiduciary shield doctrine as applied in *Rollins* precluded personal jurisdiction over him. The court's astute analysis bears quoting at length:

> "Clearly, the facts in *Rollins* are distinguishable from those in the case at bar. The *Rollins* court found it very significant that Ellwood's actions were motivated by his employment status rather than personal interests and that he had little or no alternative besides unemployment. In the present case, Everly freely chose to accept a directorship in E&B, with full knowledge that E&B was an Illinois corporation conducting a mining operation in Illinois. We find there to be a meaningful difference between Everly's status as a corporate director of an Illinois corporation and Ellwood's status as a Maryland police officer sent to retrieve Rollins. Based on the analysis used by the *Rollins* court, we do not find the fiduciary shield doctrine applicable in this instance. Under Illinois law, the business and affairs of a corporation are to be managed by its directors. (Ill. Rev. Stat.1989, ch. 32, par. 8.05 (now 805 ILCS 5/8.05 (West 1992)).) When Everly accepted his position as director of E&B, he knew or should have known such a position involves business transactions in Illinois. Furthermore, his position as director of an Illinois corporation afforded him the full protection of Illinois law in his business interests related to E&B. To avail himself of the benefits of Illinois law and to then claim Illinois courts have no personal jurisdiction over him was not a result the *Rollins* court envisioned in adopting the fiduciary shield doctrine. Accordingly, we find that the trial court erred in granting Everly's motion to dismiss on jurisdictional grounds." *Id.* at 747-48.

¶ 43    The First District followed *Morse* in *International Business Machines Corp. v. Martin Property & Casualty Insurance Agency, Inc.*, 281 Ill. App. 3d 854 (1996) (*IBM*), where an Illinois corporation was sued together with Arnold Skoller, its president and director, who resided outside Illinois. The suit was based on actions Skoller took as president and director of the Illinois corporation. Citing *Rollins*, Skoller objected to personal jurisdiction, but the appellate court found *Morse* "directly on point." *Id.* at 862. The court reasoned that, "[a]s a director and officer of an Illinois corporation, Skoller tacitly accepted both the duties and benefits conferred upon him by Illinois," and that "[h]is position within [the corporation] and the existence of the Illinois long-arm statute gave fair warning to Skoller that he may one day be haled into court here for his conduct as an officer and director." *Id.*

¶ 44    We distinguish *Rollins* for essentially the same reasons as *Morse* and *IBM* did. Defendant was personally involved in the acquisition of The Ledger, a newspaper published in Illinois. Later, when BBL was organized as a limited liability company under Illinois law and availed itself of this state's benefits, defendant freely became the company's first president. In that capacity, defendant signed an employment contract directing that it would be construed in accord with Illinois law. While the Maryland police officer in *Rollins* reasonably would never have anticipated when he took his job that he would one day be sued in Illinois for work-related conduct, defendant should have foreseen that he might be called to account in an Illinois court for his business decisions regarding the Illinois corporation of which he was president.

¶ 45    *Alpert v. Bertsch*, 235 Ill. App. 3d 452 (1992), the second case on personal jurisdiction cited by defendant, was decided four years before *IBM* by the same division of the First District. The plaintiff in *Alpert* sued the directors of a Delaware corporation licensed to transact business in South Carolina. The plaintiff resided in Illinois but the defendants lived elsewhere. The plaintiff alleged that he was denied stock options due him under his employment contract with the corporation. *Id.* at 455-57. The plaintiff claimed that personal jurisdiction lay over the defendants because they directed various communications to the plaintiff in Illinois, including the notice of his termination and their refusal to deliver the stock. *Id.* at 459, 461. Without judging the sufficiency of those contacts, the appellate court held that jurisdiction was absent because the defendants undertook their actions "in their representative or fiduciary capacity on behalf of the corporation, and not as part of a conspiracy or secret partnership." *Id.* at 461.

¶ 46    As decisions of sister appellate districts, neither *Alpert*, *IBM*, nor *Morse* binds us (see *People v. Damkroger*, 408 Ill. App. 3d 936, 944 (2011)), but we believe that the latter two decisions reflect the better understanding of the fiduciary shield doctrine, namely, that the mere fact that the defendant has acted in a representative or fiduciary capacity within the forum state will not preclude the exercise of personal jurisdiction. A sounder reason for the result in *Alpert* would have been that the defendants simply lacked sufficient contacts with Illinois.

¶ 47    Based on the reasoning in *IBM* and *Morse*, we hold that the trial court's jurisdictional determination is not against the manifest weight of the evidence. Defendant had sufficient contacts with Illinois such that calling him to answer here did not offend traditional notions of fair play and substantial justice.

-13-

B. Wage Act Claim

¶ 49     Next, defendant argues that the trial court erred in holding him personally liable on plaintiff's claim under the Wage Act. He makes several subpoints, all of which we find to be without merit.

¶ 50     Section 5 of the Wage Act provides: "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5 (West 2012).

¶ 51     We note that, as at trial, defendant does not dispute that plaintiff was owed severance pay by the letter of the employment contract.

¶ 52                                  1. Liability of BBL

¶ 53     Defendant first argues that he cannot be held liable under the Wage Act because there has been no finding that BBL is liable under the Wage Act. He says:

"[T]he lower court cannot find [that] Defendant 'knowingly permitted' a violation of [the Wage Act] by BBL without a finding that BBL violated the Act. Put differently, a finding of a violation of [the Wage Act] by an employee's employer is a necessary element to finding that the employer's officer 'knowingly permitted' that violation."

Plaintiff submits that defendant forfeited this contention by failing to raise it in his posttrial motion. A posttrial motion, however, is not necessary to preserve issues in an appeal from a bench trial. See Ill. S. Ct. R. 366(b)(3)(ii) (eff. Feb. 1, 1994) ("Neither the filing of nor the failure to file a post-judgment motion limits the scope of review."). What caused the forfeiture here, rather, is defendant's failure altogether to raise the contention below, whether at trial or in his posttrial motion. "It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal." *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996); see also *Bridges v. Neighbors*, 32 Ill. App. 3d 704, 707 (1975) (Rule 366(b)(3)(ii) does not excuse total failure to raise the issue in the trial court).

¶ 54                              2. Defendant's Ohio Residency

¶ 55     Defendant's next contention is that the Wage Act does not reach him because he is an Ohio resident and, despite being president of BBL, an Illinois company, he had little or no contact with Illinois in that capacity.

¶ 56     Section 1 of the Wage Act states that it "applies to all employers and employees *in this State*, including employees of units of local government and school districts, but excepting employees of the State or Federal governments." (Emphasis added.) 820 ILCS 115/1 (West 2012). Section 2 defines "employer" to include

"any individual, partnership, association, corporation, limited liability company, business trust, employment and labor placement agencies where wage payments are made directly or indirectly by the agency or business for work undertaken by employees under hire to a third party pursuant to a contract between the business or agency with the third party, or any person or group of persons acting directly or indirectly in the interest of an

employer in relation to an employee, for which one or more persons is gainfully employed." 820 ILCS 115/2 (West 2012).

Section 13 states: "[A]ny officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." 820 ILCS 115/13 (West 2012).

¶ 57     As we read the interplay of these provisions, any "employer," whether person or entity, must be "in this State" for the Wage Act to apply. See *Glass v. Kemper Corp.*, 920 F. Supp. 928, 931 (N.D. Ill. 1996) ("In plain, grammatically correct English, then, the Wage Act applies to a group consisting of employers and employees, all of whom are in Illinois.").

¶ 58     This is not to say, however, that an officer or agent must be physically present in Illinois in order to be regarded as "in this State." The meaning of a statute is a question of law, which we review *de novo*. See *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 21. The phrase "in this State" is not defined in the Wage Act. The only guidance we have found in Illinois case law is our decision in *Khan v. Van Remmen, Inc.*, 325 Ill. App. 3d 49 (2001).

¶ 59     The plaintiff in *Khan* brought a Wage Act claim against both his former employer, a temporary placement agency named Van Remmen, Inc. (VRI), and its president, Thomas Haynes. The plaintiff was an Illinois resident, while VRI was headquartered, and Haynes resided, in Wisconsin. The plaintiff alleged that the defendants unlawfully withheld wages that the plaintiff earned through a Wisconsin placement that VRI arranged. The trial court dismissed the action for lack of personal jurisdiction. On appeal, the plaintiff argued that jurisdiction was proper because the defendants committed a tort, namely a Wage Act violation, in Illinois. See 735 ILCS 5/2-209(a)(2) (West 2012) (jurisdiction exists over a cause of action arising from "[t]he commission of a tortious act within this State"). Consequently, this court had to determine whether the plaintiff adequately pled the elements of a Wage Act violation by the defendants. We held that the pleadings and affidavits on file did not suggest that VRI and Haynes were "employers *** in this State" (820 ILCS 115/1 (West 2012)). We reasoned:

> "The fact that VRI placed four individuals with Illinois companies over a five-year period does not change our conclusion. VRI had its principal place of business in Wisconsin, had no physical presence in Illinois, and did not place plaintiff with an Illinois company." *Khan*, 325 Ill. App. 3d at 60.

We cautioned, however, that we were "not purport[ing] to create an all-encompassing definition of 'employers in this State' for purposes of the Wage Act," but rather were "determin[ing] only that under the circumstances of this case plaintiff has not pleaded any facts from which we could conclude that VRI or Haynes was an employer in this state." *Id.* at 60-61.

¶ 60     If it had been dispositive in our minds that VRI had neither its principal place of business nor a physical presence in Illinois, we would not have also mentioned that VRI "did not place plaintiff with an Illinois company." Since we did mention it, and also declined to provide a general definition of "employers *** in this State" under section 1, we left open the possibility that a corporation with no headquarters or physical presence in Illinois can still qualify as an "employer" under the Wage Act. By analogy, an officer or agent who has had

little or even no physical presence in Illinois in the course of his business duties can, nonetheless, be deemed "in this State." Though we abstain from offering a comprehensive definition of the phrase "in this State" as applied to individuals, we hold that the core concept is met on these particular facts. Although defendant was physically located in Ohio, his offices there were part of the operational center of a publishing conglomerate that included multiple subsidiaries, one of which was BBL. BBL had its principal place of business in Illinois, with defendant as its president.

¶ 61    Defendant claims that his role as BBL's president was "passive," but he cites nothing in the record to support this. Moreover, his April 2010 declaration to the bankruptcy court described his duties as more robust. Defendant stated therein that he was "currently responsible for all functions of [BPC's] management." The evidence at trial confirms the natural inference that defendant had ultimate oversight of BPC's subsidiaries, including BBL. Plaintiff reported to Ellingham, who reported to defendant. Defendant's intent for a closer connection to BBL is witnessed by his becoming its president rather than remaining as simply president of BPC. Defendant testified that, as part of his responsibilities, he would receive financial reports from BPC's subsidiaries. Consistent with this, defendant affirmed in the bankruptcy declaration that, "[i]n his capacity as [BPC's and BBL's] President and Chief Executive Officer, [he was] familiar with [BPC's and BBL's] books and records, financial affairs, business[,] and operations."

¶ 62    Our holding has some additional support in *Adams v. Catrambone*, 359 F.3d 858, 863 (7th Cir. 2004), where the Seventh Circuit Court of Appeals held that "nonresidents of Illinois who work in that state for an in-state employer may qualify as employees within the protection of the Wage Act." The plaintiff in *Adams* was a Michigan resident who had been employed by an Illinois corporation as a salesperson. The plaintiff did "substantial work" for the corporation, and "[m]ost of that work took place in Illinois." *Id.* at 861. The court found that the Wage Act did not provide that covered employees must be residents of Illinois. *Id.* at 862-63. *Adams* is unclear, however, as to what kind of contact a nonresident employee must have with Illinois in order to be considered "in this State"; the court did not specify whether the "work" the plaintiff performed in Illinois involved his actual physical presence in this state. Regardless, *Adams* at least stands for the proposition that nonresident employees are not outside the Wage Act's coverage. As the *Adams* court found no residency requirement for employees, so we find no residency requirement for employers.

¶ 63    Our holding recognizes the reality that today's communications technology permits managers to achieve a virtual presence between states. Not only was defendant president and CEO of BPC, BBL's parent company, but he showed an intent to assume closer control of BBL by becoming its president, as well. BBL did extensive business in this state by publishing a local newspaper. As we implied in *Khan*, the phrase "in this State" does not exclude entities physically situated outside Illinois. No such restriction exists with regard to individuals, either. We hold that defendant was "in this State" as contemplated by section 1 of the Wage Act.

¶ 64      3. Defendant's Knowing Permission of a Wage Act Violation

¶ 65  As noted, section 13 of the Wage Act states: "[A]ny officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." 820 ILCS 115/13 (West 2012). In *Andrews*, the supreme court arrived at a concept of "knowing permission" under section 13. We will sustain the trial court's application of that standard to the facts at hand unless the court's determinations are against the manifest weight of the evidence. *Ashley v. IM Steel, Inc.*, 406 Ill. App. 3d 222, 235 (2010).

¶ 66  The Wage Act distinguishes two kinds of "employers": (1) those who are "employers" by virtue of section 5 of the Wage Act because, by contract or agreement, they owe the employee compensation; and (2) those who are "employers" by virtue of section 13 of the Wage Act because they are officers or agents who "knowingly permit" the contractually obligated section 5 employer to withhold the compensation. See *Andrews*, 217 Ill. 2d at 107-09. Section 5 employers cannot claim inability to pay as a defense. *Id.* at 107 (the duty of contractually obligated employers under section 5 to pay compensation is "strict, with no consideration given to the *** ability to effectuate compliance"); see also *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d 668, 676 (2004) ("Section 5 of the Wage Act does not require that plaintiffs prove that the [section 5] employer wilfully failed to pay the final compensation. It is enough, according to the statute, that plaintiffs were simply not paid by the next regularly scheduled payday after separation."). Section 13, however, "reserves personal Wage Act liability for those individual decisionmakers who knowingly permitted the Wage Act violation" by the section 5 employer. *Andrews*, 217 Ill. 2d at 109. Accordingly, where a section 5 employer lacks the ability to pay the compensation, its officers and agents cannot be said to have "knowingly permit[ted]" the Wage Act violation. Permission under section 13 implies ability to arrange payment by the section 5 employer; hence, where payment is impossible, permission is impossible. See *Ashley*, 406 Ill. App. 3d at 242 ("a corporation's inability to pay employees eliminates any possibility that the [section 13] employer acted wilfully when failing to compensate employees, thereby negating liability under the [Wage Act]").

¶ 67  In the court below, defendant made the twofold argument (1) that he delegated to subordinates the posttermination matters concerning plaintiff and thereafter lacked knowledge of whether BBL paid plaintiff his severance; and (2) that, in any case, BBL lacked the financial ability to pay plaintiff his severance. On appeal, defendant raises only BBL's ability to pay. He claims that this case is similar to *Andrews*.

¶ 68  The defendants in the Wage Act suit in *Andrews* were Kowa Printing Corporation and its sole officer and director, Thomas Kowa. In 1996, Kowa Printing suffered a sharp financial decline and subsequently was given a default notice by its only secured creditor, BankIllinois. For a time, BankIllinois agreed to forbear. In March 1998, Thomas Kowa executed an agreement for the peaceful surrender of Kowa Printing's assets in the event of foreclosure. In the months that followed, Thomas Kowa found a potential buyer for the company, but negotiations foundered on the matter of the buyer's responsibility for the accrued vacation time of Kowa Printing's employees. On April 16, 1998, the employees' union rejected the potential buyer's second purchase offer. *Andrews*, 217 Ill. 2d at 104-05. A few hours later,

BankIllinois "foreclosed on the loans, seized the Kowa Printing facility, and sent plaintiffs home." *Id.* at 105. "From that point forward," Thomas Kowa "had [no] access to Kowa Printing's assets or accounts." *Id.* The plaintiffs, union employees of Kowa Printing, sued because they were not paid their final vacation and severance pay. *Id.* The issue on appeal was whether Thomas Kowa was liable as a section 13 employer. The supreme court held that he was not:

"At the time of plaintiffs' separation from Kowa Printing, Thomas Kowa was no longer in control of Kowa Printing. Plaintiffs' employment was terminated on April 16, 1998, after BankIllinois seized Kowa Printing and all of its assets. At this point, BankIllinois was calling the shots, and a violation of section 5 simply was not within Thomas Kowa's ability to permit, knowingly or otherwise." (Emphasis omitted.) *Id.* at 112-13.

The court also rejected the plaintiffs' suggestion that Thomas Kowa acted wilfully in retaining them as employees despite the inevitability of Kowa Printing's seizure by creditors. The court disagreed that Kowa Printing's fate was inevitable and found that Thomas Kowa "made every effort to ensure that plaintiffs' livelihoods survived Kowa Printing's unexpected financial downturn." *Id.* at 114.

¶ 69        Defendant's argument here ties in with his position as to when plaintiff's severance was required to be paid. According to defendant, plaintiff was not entitled to a single-sum payment of the salary owed him for the balance of his three-year employment term. Rather, plaintiff "should have been paid his base salary of $85,000 on a biweekly basis until his non-compete had run." After the one-year noncompetition term expired, plaintiff would be "entitled to a lump sum." Defendant's primary stance is that he is not liable at all because, at the time plaintiff was terminated, BBL was "insolvent" and unable to pay his severance. Defendant alternatively contends that in no case was BBL able to pay the severance past the April 2010 bankruptcy filing.

¶ 70        The trial court found (1) that the employment contract required that the severance amount be paid as a single sum, which under the Wage Act was due "no *** later than the next regularly scheduled payday" for plaintiff (820 ILCS 115/5 (West 2012)), in September 2009; and (2) that only with the bankruptcy filing in April 2010 did BBL lose control over its assets and defendant no longer have the ability to permit a violation of section 5. Consequently, the court determined that defendant "knowingly permit[ted]" (820 ILCS 115/13 (West 2010)) the Wage Act violation that occurred in September 2009, and the court entered judgment against defendant for the full $156,696.12 owed for the remaining contract term.

¶ 71        On the contract interpretation issue, our aim is to "ascertain and give effect to the intent of the parties." *Allianz Insurance Co. v. Guidant Corp.*, 387 Ill. App. 3d 1008, 1027 (2008). "The best indication of the parties' intent is the language of the contract itself." *Id.* The construction of a contract presents a question of law, which we review *de novo*. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007).

¶ 72        Defendant points to article 3.5 of the employment contract, which states:

"Upon an Involuntary Termination of the employment relationship by either Employer or Employee prior to expiration of the Term, Employee shall be entitled, *in consideration of Employee's continuing obligations hereunder after such termination* (including,

without limitation, Employee's non-competition obligations), to receive his pro rata salary through the date of such termination plus the severance amount set forward in Exhibit A." (Emphasis added.)

Relying on the italicized language, defendant submits that the only effective means to enforce the noncompetition requirement, for which the *pro rata* payment and severance amount were given as consideration, was for BBL to pay plaintiff "on a continuing basis" throughout the noncompetition term. Against the trial court's construction of the contract, defendant notes that "[t]he term 'lump sum' is nowhere in the contract." This criticism is odd given that defendant's own reading of the contract contemplates a lump sum. According to defendant, plaintiff was to be paid the remaining balance under the contract in biweekly installments (the same schedule for salary payments as if he were still employed) until the end of the noncompetition period, at which point he would receive an aggregate sum for the remaining balance. Defendant's interpretation would require the same degree of textual manipulation of which he accuses the trial court. Nor can we say that his proposed construction is necessary lest the noncompetition clause be rendered a nullity. The clause may be enforced by an action to recoup all or part of the lump-sum severance amount paid upon "Involuntary Termination."

¶ 73     We also note that defendant points to plaintiff's testimony at trial that his "continuing obligation [not to compete] would be met with a continuing payment by [BBL]." Defendant implies that this is a damaging admission, but cites no authority by which we can accord legal significance to it.

¶ 74     We conclude that, under the terms of the contract, plaintiff was owed the sum of $156,696.12, which the Wage Act required to be paid "no *** later than the next regularly scheduled payday for such employee" (820 ILCS 115/5 (West 2012)).

¶ 75     Next, we uphold the trial court's determination that defendant knowingly permitted BBL to withhold the single-sum payment due upon plaintiff's termination. First, we sustain the trial court's determination that BBL had the ability to pay the severance amount by the next regularly scheduled payday for plaintiff, which was in September 2009. Defendant appears to argue that we cannot consider whether BPC had the funds to meet the expenses of its subsidiary, BBL. Defendant asserts that "BPC was under no obligation, legal or otherwise, to fund BBL's losses," and that plaintiff lodged no Wage Act claim against BPC. Defendant, however, made no clear divide between BPC's and BBL's finances at trial. For instance, his means for contesting the Wage Act claim below was to introduce evidence of how BPC lost financial autonomy once the July 20, 2009, forbearance agreement was signed. Defendant cannot now urge us to distinguish the financial states of BBL and BPC.

¶ 76     Defendant also claims that this case is similar to *Andrews* because, at the time plaintiff was terminated, BBL was suffering heavy financial losses. As the trial court noted, however, BBL continued to pay business expenses, including payroll, in the wake of plaintiff's termination. Defendant acknowledged this in his trial testimony, but claimed that, in August 2009, BBL ceded control of its finances to Huron, the financial consultant placed at BBL by the first lienholder, and to Mesirow, BBL's own financial consultant. The record, however, contains no evidence, apart from defendant's testimony, that BBL lost its autonomy before

filing for bankruptcy. Defendant claimed in his testimony that the July 2009 forbearance agreement allowed Huron to give "marching orders" to BPC (here, as noted above, defendant treats BBL and BPC as interchangeable), but, as the trial court correctly noted, the agreement by its terms called for Huron to "assess and monitor" BPC's finances. There is no language granting Huron control of those finances. It was within the trial court's province to discount defendant's testimony and conclude that BBL did have discretion to pay plaintiff but chose to allocate resources elsewhere. *Andrews* is patently distinguishable, as there the company indisputably lost all control of its assets before the plaintiffs were terminated. See *Andrews*, 217 Ill. 2d at 112-13.

¶ 77    Second, defendant does not dispute that he was aware of BBL's Wage Act violation. The evidence leaves no doubt of notice. Twice in August 2009, plaintiff inquired directly of defendant what he intended regarding the severance pay. In December 2009, plaintiff wrote defendant demanding the severance pay. Defendant disputes, however, that he himself had the ability to arrange for the payment. He states:

> "The lower court's holding that Defendant as president of BBL somehow maintained control of BBL's cash *** is manifestly against the record. Plaintiff specifically recommended that 'all accounting work' be transitioned from his wife in Illinois to Tipp City to improve profitability for which his employment agreement would pay him handsomely. At all times he worked with Mr. Ellingham and member-manager BPC to accomplish this goal."

The question, however, is not who routinely handled BBL's disbursements. The question is whether defendant had the authority to direct the severance payment once he was made aware that the obligation was outstanding. The evidence establishes that he did have such authority as president of BBL.

¶ 78    Finally, defendant suggests that plaintiff's Wage Act claim lacks merit because "[he] himself ran BBL into the ground." This point has no merit. Whatever plaintiff's performance as publisher, defendant did not claim at trial that his termination was for cause. Therefore, plaintiff was owed severance under the terms of the employment contract.

¶ 79    For the foregoing reasons, we uphold the trial court's determination that defendant knowingly permitted BBL to violate the Wage Act.

¶ 80                              C. Attorney Fees and Interest

¶ 81    Defendant's final contention is that the trial court erred in awarding plaintiff attorney fees and prejudgment interest. Plaintiff claims that defendant forfeited this contention by failing to raise it in his posttrial motion. In fact, defendant's posttrial motion did contain a specific objection to plaintiff's request for attorney fees and interest. Also, defendant had argued at trial that plaintiff's recovery should be strictly limited to the sums specified in the employment contract. Therefore, defendant preserved this contention for appeal.

¶ 82    The statutory authority for the award of prejudgment interest was section 2 of the Interest Act (815 ILCS 205/2 (West 2012)), which prescribes an award of interest on "all moneys after they become due on any *** instrument of writing." The authority for the award of attorney fees was section 1 of the Attorneys Fees in Wage Actions Act (705 ILCS 225/1

-20-

(West 2012)), which provides:

> "Whenever a[n] *** employee brings an action for wages earned and due and owing according to the terms of the employment, and establishes by the decision of the court or jury that the amount for which he or she has brought the action is justly due and owing, and that a demand was made in writing at least 3 days before the action was brought, for a sum not exceeding the amount so found due and owing, then the court shall allow to the plaintiff a reasonable attorney fee of not less than $10, in addition to the amount found due and owing for wages, to be taxed as costs of the action."

Aside from contesting the underlying liability, defendant does not dispute that plaintiff met the qualifications in these provisions. Defendant argues, rather, that the awards were precluded by article 3.5 of the employment contract, which sets forth the severance amount due plaintiff in the event of an "Involuntary Termination" and further states:

> "Employee's rights under this Section 3.5 are Employee's sole and exclusive rights against Employer or its affiliates, and Employer's sole and exclusive liability to Employee under this Agreement, in contract, tort, or otherwise, for any Involuntary Termination of the employment relationship. Employee covenants not to sue or lodge any claim, demand or cause of action against Employer for any sums for Involuntary Termination other than those sums specified in this Section 3.5."

¶ 83   Defendant believes that the foregoing language constitutes a contractual waiver of plaintiff's right to seek attorney fees and interest. We disagree. Defendant cites the rule that "[i]ndividuals generally may waive substantive rules of law, statutory rights, and even constitutional rights enacted for their benefit." *In re Estate of Ferguson*, 313 Ill. App. 3d 931, 937 (2000). The waiver must be "knowing, voluntary, and intentional." *Id.*

¶ 84   A recent case from the First District Appellate Court, *Village of Bellwood v. American National Bank & Trust Co.*, 2011 IL App (1st) 093115, illustrates the requirements for the knowing, voluntary, and intentional relinquishment of a statutory right. The plaintiff municipality brought an eminent domain action to acquire certain parcels of property. In the course of the litigation, the plaintiff and the property owners filed with the trial court stipulated judgment orders reciting the amount of compensation to be paid for the parcels and stating that the orders were final and conclusive and that the parties waived their rights to appeal. *Id.* ¶¶ 1-5. Before submitting the agreed compensation, however, the plaintiff changed its mind and moved to abandon the eminent domain proceeding. *Id.* ¶¶ 6-7. The trial court denied the motion. *Id.* ¶ 7.

¶ 85   The appellate court reversed, finding (1) that the plaintiff had a statutory right to abandon the eminent domain action prior to taking possession of the parcels; and (2) that the stipulated judgment orders did not constitute a waiver of that right. *Id.* ¶¶ 21-25. On the waiver issue, the court said:

> "[T]he agreed orders made no reference to the statutory right to abandon or that [the plaintiff] specifically waived that right. The only intentional relinquishment of a known right was the right of either party to contest the substance of the agreed orders. At oral arguments the agreed orders were referred to as 'heavily negotiated documents.' Had the parties intended for [the plaintiff] to waive its statutory right to abandon, a provision

stating such should have been included. The absence of any reference to the abandonment statute in the agreed orders leads to the conclusion that, in this case, the agreed orders in no way precluded [the plaintiff's] abandonment of the eminent domain proceeding. Had the agreed orders included a waiver of [the plaintiff's] right to abandon the eminent domain proceeding, we would have reached a different conclusion. However, that is not the case that is before this court." *Id.* ¶ 25.

Likewise here, the employment contract was the result of negotiations. For instance, defendant testified that he originally proposed a noncompetition term of five years but that a shorter term was ultimately agreed on. Following the reasoning in *Village of Bellwood*, we assume that, if the parties had intended to preclude plaintiff from seeking attorney fees or interest, that intention would have been overtly expressed in the employment contract. No such manifestation of intent appears in the uniformly general language above. Accordingly, we hold that the trial court did not err in awarding attorney fees and interest.

¶ 86                                    III. CONCLUSION

¶ 87        For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

¶ 88        Affirmed.