2026 IL App (1st) 241953-U

SECOND DIVISION
March 17, 2026

No. 1-24-1953

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS *ex rel.* ILLINOIS DEPARTMENT OF LABOR, | ) ) ) | Appeal from the Circuit Court |
| Plaintiff-Appellant, | ) ) | of Cook County |
| v. | ) ) | 19L13723 |
| QUALITY THERAPY & CONSULTATION, INC., FRANCES M. PARISE, and JOHN PARISE, | ) ) ) ) | Honorable John J. Curry, Jr., Judge Presiding |
| Defendants-Appellees. | ) | |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**O R D E R**

¶ 1 *Held*: Amended statute did not make corporate officers personally liable for employer's failure to pay wages.

¶ 2     The Illinois Department of Labor sued a dissolved corporation, Quality Therapy and Consultation, Inc. (QTC), and its former owners and officers, Frances M. Parise and John Parise, because the corporation had abruptly shut down without paying several weeks of wages earned in September 2017. The Wage Payment and Collection Act requires employers to pay final compensation no later than the next regular payday. See 820 ILCS 115/5 (West 2016) (Wage Act). Section 2 of the Wage Act defines "employer" as that term is traditionally understood and section

13 adds that corporate officers who "knowingly permit" statutory violations are also "employers." 820 ILCS 115/2, 13 (West 2016). After a two-day bench trial concerning QTC's ability to pay, the circuit court entered a $1.4 million judgment against QTC only. The evidence showed that shortly after QTC announced that it would be closing in 60 days, its receivables dropped precipitously, its bank account was seized and applied to its line of credit, and then its remaining assets were taken by the federal government. The circumstances made QTC's payroll obligation impossible, leading the circuit court to find that the Parises did not knowingly permit QTC's underpayment and were not personally liable under section 13. See *Elsener v. Brown,* 2013 IL App (2d) 120209, ¶ 66 ("where payment is impossible, permission is impossible"). The Department concedes these findings. However, it asks that we interpret an amendment to section 13 as impliedly expanding the definition of "employer" in section 2 to the extent that section 2 encompasses the Parises. The Parises counter that the Department's interpretation is not only illogical, but it would also be a profound change in corporate law and was deemed a "patently absurd" theory by the Supreme Court in *Andrews v. Kowa Printing Corp.*, 217 Ill. 2d 101, 109 (2005).

¶ 3    The following facts are not in dispute. QTC was founded by the Parises in 1996 and operated for about 20 years, providing occupational therapy, speech therapy, and physical therapy services primarily in Illinois to long-term care facilities. Frances was the corporation's president and secretary and John was the chief executive officer. They each owned 50% of QTC and shared authority for business decisions. QTC's financial problems began in 2015, in part because its Medicare billing practices came under federal investigation and the corporation began incurring substantial legal fees for itself and its employees. In addition, a primary client, the State of Illinois, became slow to pay during a budget crisis. John testified that the State's payments were 12-to-18

months behind and that QTC would continue to work for its slow paying clients rather than sever relationships. He also testified that Medicare reduced some of its reimbursement rates and began requiring additional paperwork from providers like QTC, which took away from the therapists' billable hours. These and other factors caused QTC's slim profit margin to shift into the negative.

¶ 4 Frances testified that in August 2017, QTC's operations director told her that the company could not meet its payroll obligations in September 2017. QTC's standard payroll processing time was two weeks and its normal paydays would have been September 1st, September 15th, September 29th, and October 13th. Frances testified that when she called John, he confirmed that staff were not going to be paid for the work that they performed in September. John testified that he hired attorney Howard Edelman, who specialized in advising distressed and failing businesses. On September 1st, under John's direction, QTC issued a "WARN Act" notice to its employees, advising them that the business would close and all employment would cease in 60 days. *See* 820 ILCS 65/1, 5, 10 (West 2016) (Illinois Worker Adjustment and Retraining Notification Act requires employers with more than 75 full-time staff to give 60 days' notice for mass layoff, relocation, or employment loss). There was no mention of whether staff would receive their regular paychecks. At the time, John believed that QTC would be able to pay its employees for those 60 days. However, on Friday, September 22nd, John learned that QTC could not meet its payroll on Friday, September 29th and had access to only about half the funds that it needed. He had a meeting on Monday, September 25th with his "distressed business advisors," including attorney Edelman, to discuss strategies to deal with QTC's financial predicament. On September 26th, the Parises told staff that QTC would have to close on September 30th instead of October 31st. On September 28th, the Parises informed staff that they would not be receiving their September wages and for

the first time, the Parises began cancelling upcoming shifts. During September, the Department received the first of 93 wage claim applications from QTC employees that would eventually total $550,496, exclusive of statutory penalties.

¶ 5       QTC had been relying on its $3 million line of credit to fund payroll on a timely basis and then it would pay down or pay off the balance when it received client payments. When the Parises notified the bank that QTC would be closing, the bank immediately called the corporation's line of credit and froze all funds on hand. On October 5th, QTC was notified that the bank was going to apply all of QTC's funds, including its subsequent deposits, to QTC's debt. The bank refused to honor any checks that QTC wrote. John testified that QTC never regained control of its account and was unable to access any of its money to pay its employees or for any other purpose. Due to the bank's actions, QTC could not meet payroll on October 13th. The circuit court emphasized that no evidence to the contrary was adduced. In October, QTC had to open an account at a second bank in order to collect its clients' credit card deposits and ACH credits. By mid January 2018, QTC had paid the line-of-credit debt in full and the first bank ended the relationship. In February, QTC closed its account at the second bank and opened an account with a third bank in order to receive client payments. The third bank was also where QTC deposited a $114,000 income tax refund. Including the IRS refund, QTC deposited more than $500,000 into the third bank in 2018.

¶ 6       Julie Porter, who was QTC's attorney in the federal investigation, had previously worked at the U.S. Attorney's Office, serving as chief of the financial crimes unit, as chief of the criminal division, and as chief of the general crimes unit. Porter testified that while she was engaged as QTC's attorney, she was in direct contact with the federal agency and was providing detailed accounts of QTC's assets and liabilities. QTC entered into a settlement with the federal agency

that required the company to turn over its bank account balance and assign all of its receivables to the government so that the agency could pursue collections directly. Porter asked whether QTC could use its client receivables to pay its former employees, but the U.S. Attorney's office would not give consent. When QTC received the income tax refund, Porter asked the federal government's attorney about using the bank balance to satisfy QTC obligations to its former employees. The federal attorney would not agree to this. In all, QTC relinquished $1.1 million to the federal agency. Porter testified, "QTC very much wanted to use whatever money it had to resolve employee liabilities." In Porter's experience, however, "it would be incredibly foolhardy and problematic to unilaterally make decisions about how to satisfy different liabilities when the government is *** assessing how much you're going to be able to pay *** it." Porter specifically advised QTC that it should not use its bank balance to pay its employees.

¶ 7    In December 2019, the Department filed a three-count complaint, which it amended in February 2020, directing individual counts against QTC and its two officers concerning QTC's unpaid wages and other compensation. The Department contended in relevant part that all three defendants met the definition of an employer under section 2 of the Wage Act. QTC had been dissolved and was found to be in default. Frances and John, who were represented by separate counsel, moved for summary judgment on the amended complaint, arguing that the state supreme court's decision in *Andrews*, 217 Ill. 2d at 108-09, precluded a corporate officer's individual liability under section 2 of the Wage Act. The Department responded with the theory it now presents on appeal: that Frances and John each acted directly or indirectly in QTC's interest, which made them "employers" within the meaning of section 2. The circuit court denied the motions for summary judgment and then presided over the two-day bench trial just summarized above focusing

on QTC's ability to pay.

¶ 8    After the trial, the court entered a default judgment against QTC in the amount requested by the Department. The court rejected the Department's argument that the Parises were "employers" as that term is defined in section 2 of the Wage Act and found that only QTC was the wage claimants' employer under section 2. The court further found that the claims against Frances and John "under § 2" were "denied" and that "[t]he only proper Wage Act claim brought under the pleadings against Frances and John is grounded in § 13." The court found QTC had been unable to pay its employees as of September 22, 2017, and, since the employer was incapable of meeting its payroll, its corporate officers had not knowingly permitted the underpayment and were not liable under section 13.

¶ 9    The Department's only appellate contention is that the circuit court erred in finding that the Parises were not employers within the meaning of section 2. It acknowledges that its argument runs counter to the Supreme Court's decision in 2005 about section 2 in *Andrews*, 217 Ill. 2d 101, but contends that the amendment to section 13 that took effect in 2011 impliedly amended section 2 and superseded *Andrews*. Based on the Department's reading of the amendment, it adopted a regulation in 2011 that blends sections 2 and 13 and would render anyone who had a decision making role in payment decisions personally liable for unpaid wages and final compensation. See 56 Ill. Admin. Code § 300.620(a) (2014). Because section 2 defines the general term "employer" and does not include any culpability standard such as the "knowingly permit[ted]" standard in section 13 regarding corporate officers, the Department proposes that we fill in the gap by adopting the "economic realities" standard that the Supreme Court rejected as unnecessary in *Andrews*. *Id.*

¶ 10    To resolve this appeal, we must construe the Wage Act. We address the construction of a

statute *de novo*, because it is a question of law. *Id.* at 106. The primary rule of statutory construction is to ascertain and give effect to the legislature's intent. *Id.* The most reliable indication of intent is in the legislature's language, giving those words their plain and ordinary meaning. *Id.* Where the language is clear, it must be put into effect without resort to other aids of statutory construction. *Id.* In determining the statute's plain meaning, we consider the statute as a whole, the subject being addressed, and the apparent purpose for the enactment. *Weather-Tite, Inc. v. University of St. Francis,* 233 Ill. 2d 385, 389-90 (2009). If possible, a statute should be construed so that no language is rendered meaningless or superfluous. *Id.* at 390.

¶ 11    If a statute's meaning is ambiguous, courts may look beyond the statutory language and consider the law's purpose, the evil that it was intended to remedy, and the legislative history. *Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 181 (2007). Courts may also consider the consequences that would result from construing the statute in either manner and presume that the legislature did not intend inconvenient, absurd, or unjust consequences. *Alvarez v. Pappas*, 374 Ill. App. 3d 39, 44 (2008).

¶ 12    Section 2 is the Wage Act's definitions section. It defines the term "employer" as follows:

"As used in this Act, the term 'employer' shall include any individual, partnership, association, corporation, limited liability company, business trust, employment and labor placement agencies where wage payments are made directly or indirectly by the agency or business for work undertaken by employees under hire to a third party pursuant to a contract between the business or agency with the third party, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee, for which one or more persons is gainfully employed." 820 ILCS 115/2 (West

2016).

¶ 13    The Department's appeal focuses on the last clause of section 2—the one that states that "any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee," is deemed an "employer" for purposes of the Wage Act. 820 ILCS 115/2 (West 2016). The Department reads that part of section 2 in conjunction with section 13. We have underlined the prefatory phrase that the legislature added to section 13:

> "In addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act, any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." 815 ILCS 115/13 (West 2016).

¶ 14    The Department does not provide any factual or legal support for its theory that the 2011 amendment to section 13 effectively modified the terms of section 2 and dramatically changed a corporate decision maker's potential liability for wages. Precedent and the statutory language lead us to find that the amendment to section 13 had no effect whatsoever on section 2.

¶ 15    The fact that the Wage Act imposes liability pursuant to two separate and *distinct* definitions of "employer" was specifically addressed in 2013 in *Elsener*, 2013 IL App (2d) 120209, ¶ 66. The court used the term "section 5 employer," as shorthand for an "employer" as defined in section 2, who is made strictly liable for the "final compensation of separated employees" by section 5. 820 ILCS 115/2, 5 (West 2016). The court said:

> "The Wage Act distinguishes two kinds of 'employers:' (1) those who are 'employers' by virtue of section 5 of the Wage Act because, by contract or agreement, they owe the employee compensation; and (2) those who are 'employers' by virtue of section 13 of the

Wage Act because they are officers or agents who 'knowingly permit' the contractually obligated section 5 employer to withhold the compensation. See *Andrews,* 217 Ill. 2d at 107-09." *Elsener*, 2013 IL App (2d) 120209, ¶ 66.

¶ 16 The record and *Elsener* unquestionably indicate that QTC was the "employer" with strict liability under section 2, and that Frances or John would have been an "employer" subject to liability under section 13 only if Frances or John had knowingly permitted QTC's violation of the Wage Act. *Id*. If there was no distinction between the liability of the corporation and the individual officer, then there would be no reason to have two separate definitions of what constitutes an "employer."

¶ 17 The Department's appeal is based on an unpersuasive combination of the last clause of section 2 and all of section 13. The meaning of the last clause of section 2 was litigated in 2005 in *Andrews*, 217 Ill. 2d 101, where our supreme court acknowledged that the "breadth of this language is confounding." If the clause was read literally, then the clause would "make an 'employer' out of every person who possesses even a modicum of authority over another employee, from the CEO to the head of the maintenance staff, as such persons undeniably act 'directly or indirectly in the interest of an employer in relation to an employee.' " *Id.* at 107. A literal reading would result in absurdity or unjustness in part because of an employer's strict liability for wages. See 820 ILCS 115/3, 5 (West 2016). The Supreme Court "refuse[d] to believe that, in drafting section 2, the legislature set out to make every supervisory employee strictly and personally liable for the payment of his or her subordinates' wages." *Id*. at 107-108. That would be a "draconian upheaval of traditional employment law principles." *Id*. at 108 n. 1.

¶ 18 Instead, the Supreme Court followed the lead of the First Circuit Court of Appeals when it

addressed a very similar federal statute that stated: " '[a]s used in this chapter *** "[e]mployer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee.' " *Id.* at 108 n. 2 (quoting section 203(d) of the Federal Labor Standards Act, 209 U.S.C. § 203(d) (1988)). The federal court said that this definition was " 'intended to prevent employers from shielding themselves from responsibility for the acts of their agents.' " *Id.* (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1513 (1st Cir. 1983)). The federal court's reasoning was endorsed in *Andrews* when the Illinois court found that section 2 "simply confirms that an employer is liable not only for its *own* violations of the Wage Act but also for any Wage Act violations committed by its agents." *Id.* at 109. "Section 2 "defines not only who *is* the employer *** but also who may *inculpate* the employer." *Id.* at 108. Thus, section 2 begins with a list of the many types of an "employer," "as that term is traditionally understood" (*Id.* at 113), ranging from an individual person to various types of corporations, and then the concluding clause sweeps in the employer's agents. *Id.* at 108-09.

¶ 19 The Supreme Court also contrasted section 2 with section 13, which at the time was the unamended version. 820 ILCS 115/13 (West 2002). The court recognized the sharp divide between the two sections and that each serves a distinct purpose:

> "Clearly, it is this section, and not section 2, that defines who, other than the employer itself, may be treated as an 'employer' for purposes of the Wage Act. Indeed, when considered together, section 2 and section 13 form a coherent and entirely sensible policy. Section 2 confirms that an employer is liable both for its own violations of the Wage Act and for any Wage Act violations committed by its agents. Section 13, in turn, imposes personal liability on any officers or agents who knowingly permitted the Wage Act

violation. Unlike a literal reading of section 2, which imposes strict Wage Act liability upon all supervisory employees, this reading reserves personal Wage Act liability for those individual decision makers who knowingly permitted the Wage Act violation. We are confident that this reading of the Wage Act better vindicates the General Assembly's policy objectives." *Andrews*, 217 Ill. 2d at 109.

¶ 20 The court pointed out that its interpretation of section 2 would avoid rendering section 13 superfluous. *Id.* at 109. "[A]ny officer or agent with authority to effectuate compliance (or noncompliance) with the Wage Act is, by definition, a person who acts 'directly or indirectly in the interest of an employer in relation to an employee.' Thus, these people would already be classified as employers under section 2, and there would be no need to classify them as such again in section 13." *Id.* at 110.

¶ 21 *Andrews*' core holding about section 2 has been consistently applied without any court or litigant suggesting that the analysis was abrogated by the amendment to section 13 that took effect in 2011. *See e.g., Loebl Schlosman & Hackl, Inc. v. Al Abosy*, 2021 IL App (1st) 200878-U, ¶ 91 (citing *Andrews* and rejecting argument that president/principal decision maker was personally and strictly liable for firm's failure to pay severance in violation of the Wage Act); *Gibbs v. ABT Electronics, Inc.*, 2022 WL 16540182 *4 (N.D.Ill. Oct. 28, 2022) (expressly following *Andrews* and rejecting argument that any decision maker who was in a position to knowingly permit a Wage Act violation would be an "employer" regardless of whether they actually knowingly permitted the violation). See also *Automatic Sprinkler Local 281, U.A. Welfare Fund v. World Class Fire Protection, LLC*, 24-CV-674, 2025 WL 1866306, at *5 (N.D. Ill. July 7, 2025) ("The existence of section 13 speaks volumes about the meaning of the definition of 'employer.' Section 13

wouldn't be necessary if the definition of 'employer' already included the senior ranks of a company."); *Keigan v. Tiram*, 23 C 1398, 2024 WL 5389551, at *2 (N.D. Ill. Sept. 27, 2024); *Nevarez v. DynaCom Management, LLC*, 23 CV 5248, 2024 WL 1579393, at *5 (N.D. Ill. Apr. 11, 2024).

¶ 22 The amendment to section 13 was a small part of legislation enacted in 2010 which revised parts of the State Finance Act, the Code of Criminal Procedure, and sections 11, 13, and 14 of the Wage Act. See Pub. Act 96-1407, eff. Jan. 1, 2011. According to the Department, the revisions to the Wage Act "strengthened employee protections across the board" by amplifying the penalties for wage underpayments, expressly providing a private right of action, and authorizing the Department to conduct administrative hearings on wage claims. The Department argues that the legislature also "clarif[ied] that section 13's liability for those persons who knowingly permit an underpayment was "[i]n addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act.' (820 ILCS 115/13 (2016))." Thus, the Department combines the two statutes, doing away with well-regarded precedent and bringing on the absurd results that the Supreme Court kept at bay in *Andrews*. We are not persuaded by the Department's interpretation of the amendment to section 13.

¶ 23 As John points out, the Department glosses over the existence of the word "individual" at the threshold of section 2. Section 2 states, "As used in this Act, the term 'employer' shall include any *individual*, partnership, association, corporation, limit liability company," and so forth (emphasis added) (815 ILCS 115/2 (West 2016)), and the amendment to section 13 states, "In addition to an *individual* who is deemed to be an employer pursuant to Section 2 of this Act." (Emphasis added.) (820 ILCS 115/13 (2016)). The clause added to section 13 is plainly referring

to the first type of employer listed in section 2 and not to the concluding clause that the Supreme Court addressed in *Andrews*. Near the end of its appellate brief, the Department finally acknowledges the word "individual" at the beginning of section 2's list of possible "employers," but perfunctorily dismisses it: "That first part of Section 2 does not factor in the analysis." The Department reasons that an "individual" employer cannot be "deemed" to be an employer because "they would simply be an employer." John responds that this is "nothing but word salad." We agree that the Department strains to support its interpretation. We are not persuaded that the legislature rushed past the obviously relevant word "individual" at the beginning of section 2 in order to arrive at the "any person or group of persons" clause which the Illinois Supreme Court (and the First Circuit Court of Appeals) determined is legalese for an employer's agent. *Andrews*, 217 Ill. 2d at 108 (quoting *Donovan*, 712 F.2d at 1513).

¶ 24    Stated another way, if the legislature truly intended to change the meaning of section 2's "any person or group of persons" clause by amending section 13 rather than directly amending section 2, then surely the legislature would have used the same terminology in the amendment. The amendment does not use parallel wording, redefine section 2, or even declare an intention to change section 2's meaning. We will not presume that changes to one section of a statute have effectively altered another section of a statute absent legislative intent to make the alteration. Our function is to interpret the law as it was enacted by the legislature. *In re Estate of Swiecicki,* 106 Ill. 2d 111, 120 (1985). When an enactment is clear and unambiguous, as this one is, the court is not free to depart from the plain language and meaning of the statute by reading in exceptions, limitations, or conditions that the legislature did not express. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 83 (1994); see also *Estate of Swiecicki*,

106 Ill. 2d at 120 (a court does not annex new provisions, make substitutions, or read in exceptions, limitations, or conditions which depart from the law's plain meaning); 2A Sutherland Statutory Construction § 46:3 (7th ed.) ("courts owe fidelity to legislative will and intent"). Nor are we expected to "search for any subtle or not readily apparent intention of the legislature." *DiFoggio v. Retirement Board of the County Employees Annuity & Benefit Fund,* 156 Ill. 2d 377, 383 (1993). Section 2's language remains the same and its meaning has remained the same since the Supreme Court interpreted it in 2005. This reasoning also applies to the Department's contention that the amendment endorses the economic realities test that was rejected in *Andrews*, 217 Ill. 2d at 110. The contention is completely illogical. Had the legislature intended to adopt such a test, surely it would have said so in the amendment, particularly in response to *Andrews*' specific rejection of the test.

¶ 25    In the absence of any legislative history, Frances persuasively argues that the legislature enacted the amendment to resolve any confusion about the liability of individuals such as sole proprietors under sections 2 and 13. Frances contends that the legislature wanted to resolve any possible confusion about an individual employer's liability under section 13 because that person could also be liable under section 2. If anything, the 2010 amendment reinforces the distinction between section 13 liability and section 2 liability. Reading the statute this way preserves the distinction between the two sections that the Supreme Court delineated in *Andrews*, 217 Ill. 2d at 108. Section 2 continues to describe "not only who *is* the employer *** but also who may *inculpate* the employer," and section 13 continues to be a specific punitive liability provision, identifying when certain individuals can be liable, such as when those individuals cause the section 2 employer to fail to pay wages. *Id*. at 108-09. As such, the amendment to section 13 maintains the framework

1-24-1953

of the Wage Act—it did not alter the general definition set out in section 2 nor did not modify liability under section 13.

¶ 26    This reading is also consistent with the Department's contention that the legislature strengthened employee protections, but it avoids the extreme and negative consequences that the Department's interpretation would cause. The Department fails to address the fact that a ruling in its favor would upset well-established principles of corporate law. Ruling that Frances and/or John could be held strictly liable for the actions of their employer, QTC, would effectively authorize piercing the corporate veil without meeting established standards for doing so. See *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 204 (1981) ("It is a well-established principle that a corporation is separate and distinct as a legal entity from its shareholders, directors and officers and, generally, from other corporations with which it may be affiliated."); *Roiser v. Cascade Mountain, Inc.*, 367 Ill. App. 3d 559, 566 (2006) (piercing the corporate veil is disfavored and the party seeking to disregard the corporate veil must make a substantial showing): 114 Am. Jur. Proof of Facts 3d 403 (Originally published in 2010) (the doctrine of piercing the corporate veil is the rare exception to the protection that is offered by incorporation, and there is a substantial burden of proof to justify imposing personal liability). The ruling the Department seeks could create personal liability for shareholders, officers, managers, and supervisory employees, regardless of the precision with which corporate formalities were observed, and would remove the fundamental protections afforded by long-standing principles of corporate law. Such a ruling would have drastic consequences, in that it would deter business, it would discourage individuals from serving in managerial, decision-making capacities; and it would open the door to litigation that is not grounded in the true intent of the Wage Act. Furthermore, statutes that impose personal liability

should do so with clear language, and the Department's contention that the legislature has *impliedly* created this potential liability is not only legally unsound, it is unjust. See *Cassidy v. China Vitamins, LLC*, 2018 IL 122873, ¶ 17 (a court will not read a statute in a way that produces a result inconsistent with clearly expressed legislative intent or that produces absurd or unjust consequences not intended by the legislature).

¶ 27 The Department, as an afterthought, discloses in its appellate brief that it adopted a regulation which blends together sections 2 and 13 based on the Department's reading of the amendment. 56 Illinois Administrative Code § 300.620 states:

"a) As a result of PA 96-1407, any person, including corporate officers, agents, or any person who acts directly or indirectly in the interest of an employer in relation to an employee is an employer under Section 2 of the Act and may be held individually liable for wages and final compensation. For example, any person, including corporate officers and agents, acting directly or indirectly in the interest of an employer, includes, but is not limited to, actions such as being a signatory to an employment or union contract, or otherwise maintaining a decision-making role with regards to employment decisions or payment of employees. In evaluating whether any person, including officers and agents, are individually liable under the Act, the 'economic realities test' is the appropriate standard and, although no one factor is dispositive, the relevant inquiry is whether the person:

1) held a significant ownership interest in the corporation or entity;

2) exercised operational control over significant aspects of the corporation's or entity's day-to-day functions, including the compensation of employees, or had

supervisory authority over employees and was responsible in whole or in part for the alleged violation; and

       3) was personally involved in the decision to continue operations despite financial adversity during the period of nonpayment.

    b) In addition to an individual who is deemed to be an employer under Section 2 of the Act, Section 13 of the Act allows for a separate and independent basis for liability for any agents of an employer who knowingly permit the employer to violate the provisions of the Act. Such a person may be deemed to be an employer of the employees of the corporation and shall be individually liable for an aggrieved employee's wages or final compensation. For example, individual liability would attach when an individual exercises sufficient control to allocate to whom or what entity the funds would be paid and in what amount (*i.e.*, no paychecks, full paychecks, or partial paychecks) during the relevant period.

    c) As used in subsection (b):

       1) 'Knowingly' means knowledge of the existence of facts constituting the alleged violation, rather than a knowledge of the unlawfulness of the act or omission.

       2) 'Permit' means to allow to happen or to fail to prevent, regardless of the corporation's ability to pay." (eff. March 31, 2023).

¶ 28    The Department argues that we should give substantial weight and deference to its interpretation of a statute that it is charged with enforcing—particularly when the regulation has been in place since 2011 without the legislature taking corrective action.

¶ 29    However, this is a new argument on appeal and was not made part of the Department's proof at trial. The Department did not call any legislators or departmental personnel to testify about

the amendment to section 13 and the regulation that the Department subsequently adopted. It did not incorporate the regulation into its opening or closing arguments so that the defendants had an opportunity to respond. Nine weeks after the trial, when the Parises and the Department simultaneously filed proposed findings of fact and conclusions of law, the Department filed 14 pages that only briefly mentioned the existence of the regulation. This was not a timely or adequate presentation of evidence or legal support. The trial judge did not discuss it in the order on appeal. Fully a year after the trial, the Department argues that we should defer to its expertise and experience in interpreting a statute that it is charged with administering and enforcing. A party's failure to first raise a theory in the circuit court "weaken[s] the adversarial process and our system of appellate jurisdiction" and prejudices the opposing party by depriving that party of an opportunity to respond with evidence and argument. *Daniels v. Anderson*, 162 Ill. 2d 47, 59 (1994) ("Had Zografos raised the equitable conversion doctrine in the trial court, Daniels may have responded specifically to this theory with evidence and argument. Also, the trial court may have ruled on the equitable conversion theory, making findings[.]"). We find that reliance on the regulation was forfeited when the argument was not effectively presented in the circuit court. *Id.*; *Jeanblanc v. Sweet*, 260 Ill. App. 3d 249, 254 (1994) ("A reviewing court will not consider on review issues and arguments which were not presented to or considered by the trial court.").

¶ 30    In any event, we are never bound by the Department's interpretation of a statute (*Larrance v. Illinois Human Rights Comm'n*, 166 Ill. App. 3d 224, 231 (1988)) and we would only defer to a *reasonable* interpretation. *Nationwide General Insurance Co. v. Shapo*, 328 Ill. App. 3d 1028, 1031 (2002). As discussed above, the Department's interpretation is not well founded.

1-24-1953

¶ 31    The regulation that the Department created is in direct conflict with how the Supreme Court interpreted the last clause of section 2 in *Andrews*, 217 Ill. 2d 101, and, in the ensuing 20 years, the legislature has not amended that clause. The Department has no authority to disregard the Supreme Court's decision. *Larrance*, 166 Ill. App. 3d at 23 (1988) (an administrative agency is bound by an uncontested judicial interpretation of a statute); *Spraic v. U.S. R.R. Retirement Board*, 735 F.2d 1208, 1211 (9th Cir. 1984) ("the Board's non-acquiescence in *Gebbie* was improper. *Gebbie* was an interpretation of a statute the Board was charged to 'faithfully execute' by a federal court of nationwide jurisdiction. [Citation.] "It is, emphatically, the province and duty of the judicial department, to say what the law is," *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).")

¶ 32    The regulation is also flawed because it is not based on the new, clear prefatory clause in section 13. 820 ILCS 5/13 (West 2016).

¶ 33    Furthermore, the regulation would usurp decades of state and federal decisions nationwide indicating that the judiciary does not lightly disregard the corporate veil and impose personal liability. *See* 1 Treatise on the Law of Corporations § 7:8 (4th) ("corporate veils are pierced only in rare and exceptional situations, which is as it should be"). The agency has no authority to abrogate settled law or create new laws. It has no general or common law powers and derives all of its authority from its enabling statute. *Alvarado v. Industrial Comm'n*, 216 Ill. 2d 547, 553 (2005). An administrative agency "may not use its delegated power either to abridge the authority given it by the legislature or to enlarge its powers beyond the scope intended by the legislature." 73 C.J.S. Public Administrative Law and Procedure § 209 (Dec. 2025) ("Because the rulemaking power of a public administrative body or agency is a delegated legislative power, in promulgating

regulations, the agency may not exceed those powers expressly conferred on it by statute or reasonably necessary to carry out the purposes for which the statute was enacted.").

¶ 34    In addition, the consistency and duration of the agency's interpretation would be taken into consideration. *Id*.; *Radio Relay Corp. v. Illinois Commerce Comm'n*, 69 Ill. 2d 95, 101 (1977) (where an agency had been interpreting a statute for 50 years, and there was "no legislative action indicative of dissatisfaction," the court would give the agency's construction substantial deference). The Department has not cited a single instance when it deployed the regulation in administrative proceedings or when it defended the regulation in an administrative review action. If the Department has been applying the regulation, then it forfeited those instances by failing to cite them here. *Friedman v. White*, 2015 IL App (2d) 140942, ¶ 26 (forfeiture applies when a party does not cite authority for its own position). In our opinion, an untested regulation is no more influential than an appellate argument.

¶ 35    Accordingly, we reject the Department's contention that its own regulation warrants substantial weight and deference here.

¶ 36    For all these reasons, we find that the amendment to section 13 has no effect on Frances and John's potential liability and that the circuit court's ruling was correct. The judgment is affirmed.

¶ 37    Affirmed.